*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ANDREW MAURICE RANDOLPH,

Defendant-Appellant.

UNPUBLISHED
January 22, 2019

No. 321551
Genesee Circuit Court
LC No. 13-033003-FC

ON REMAND

Before: SAWYER, P.J., MURRAY, C.J., and K. F. KELLY, JJ.

PER CURIAM.

Following this panel's decision in *People v Randolph*, unpublished opinion per curiam of the Court of Appeals, issued November 24, 2015 (Docket No. 321551) (*Randolph I*), defendant sought leave to appeal in our Supreme Court. After entertaining oral arguments on the application, the Supreme Court issued an opinion partially reversing *Randolph I*—to the extent that this Court had held that defendant's failure to demonstrate plain error requiring reversal under the *Carines*[1] test was necessarily fatal to his related claims of ineffective assistance of counsel—and remanded with instructions for this Court to reexamine defendant's several claims of ineffective assistance under the two-prong *Strickland*[2] test. *People v Randolph*, 502 Mich 1, 22; 917 NW2d 249 (2018). We again affirm.

Consistent with the directions of the Supreme Court, we again consider defendant's claims of ineffective assistance of counsel. "Whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38,

---

[1] *People v Carines*, 460 Mich 750; 597 NW2d 130 (1999).

[2] *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

47; 826 NW2d 136 (2012). The "defendant has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel. . . ." *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

> Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. To establish an ineffective assistance of counsel claim, a defendant must show that (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. [*People v Lockett*, 295 Mich App 165, 187; 814 NW2d 295 (2012) (citations omitted).]

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694. The "reasonable probability" standard can be satisfied by less than a preponderance of the evidence. *Trakhtenberg*, 493 Mich at 56.

The "reviewing court must not evaluate counsel's decisions with the benefit of hindsight," but should "ensure that counsel's actions provided the defendant with the modicum of representation" constitutionally required. *People v Grant*, 470 Mich 477, 485; 684 NW2d 686 (2004), citing *Strickland*, 466 US at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). "Defense counsel is given wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases." *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008). Thus, there is a "strong presumption that trial counsel's performance was strategic," and "[w]e will not substitute our judgment for that of counsel on matters of trial strategy[.]" *Id.* at 242-243. "Yet a court cannot insulate the review of counsel's performance by calling it trial strategy." *Trakhtenberg*, 493 Mich at 52. "The inquiry into whether counsel's performance was reasonable is an objective one and requires the reviewing court to determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012) (quotation marks and citation omitted). In other words, the reviewing court must consider the range of potential reasons that counsel might have had for acting as he or she did. *Id*.

We turn first to defendant's argument that trial counsel was ineffective for failing to move to exclude the nitrate test evidence at trial. We disagree.

At the *Ginther*[3] hearing, counsel testified about his research into this matter and his trial strategy at considerable length. It is true that he stated that he felt that defendant had "pushed [him] into" the strategy of not seeking exclusion of the evidence concerning the gunshot-residue test. But upon further questioning, counsel explained that he was aware that because there are sources of nitrates aside from gunpowder, the nitrate test cannot conclusively detect the presence

---

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

of gunpowder residue. Counsel further explained that defendant had confidentially admitted that his brother, Jonathan, was the shooter in the drive-by shooting that killed the victim, further admitting that defendant was in the vehicle during the drive-by.[4] Hence, counsel was concerned that "there was a very real possibility that [defendant] *was* covered with gunshot residue" when the police collected samples from him. (Emphasis added.) Counsel's tacit suggestion was that moving to exclude evidence of the nitrate test might have prompted the prosecution to pursue further forensic testing, which might have, in turn, *conclusively* established the presence of gunpowder residue.

Counsel was also concerned that, if he tried to exclude the evidence on grounds of scientific unreliability or under the Confrontation Clause, he might prompt the prosecution to secure expert witnesses (including the person who actually administered the test), and that such experts might have testified about the test at greater length, thereby reinforcing its significance—and perhaps its reliability—in the jury's view. This was particularly true in this case because counsel's preliminary legal research indicated that, as this Court noted in *Randolph I*, slip op at 7, there is a split of authority in other jurisdictions about whether such preliminary gunshot-residue tests are admissible as proof of the presence of nitrates, which *might* be indicative of gunpowder residue. Thus, counsel would have had no guarantee that he would succeed in moving to exclude the evidence.[5] Counsel was also concerned that if he tried to exclude the evidence—or to strike any improper testimony offered about it—the jury would view his tactics as irritating and obstructionist, inferring that the defense must be "desperate" to hide important forensic evidence. This might have suggested to the jury that the nitrate-test results were inculpatory, rather than irrelevant. Furthermore, in counsel's experience, motions to strike serve no constructive purpose—once testimony is heard, it cannot be unheard any more than a bell can be unrung. He noted that, in his experience, it is imprudent to treat jurors as if they are "idiots." For those reasons, counsel sought to minimize how much testimony was offered about the nitrate test, to prevent the lay witnesses who testified about it from offering any expert opinions, and to highlight the test's lack of relevance to the jury. This strategy was intended to strengthen the defense theory of the case, which was that someone else had been the shooter, and that the police initially released defendant—*after* the positive result on the nitrate test—because they knew that there simply was not enough evidence to prove that he was the shooter beyond a reasonable doubt.

---

[4] Counsel ultimately advised defendant not to testify at trial about Jonathan being the shooter. Counsel was concerned that, based on what defendant had told him, the prosecution would be able to convict defendant for the victim's murder under an aiding-and-abetting or accessory-after-the-fact theory.

[5] This is true despite the opinion in *People v Young (After Remand)*, 425 Mich 470, 500; 391 NW2d 270 (1986). The *Young* Court criticized a precursor version of the nitrate test utilized in this case, noting that it was not a scientifically reliable method of conclusively testing for the presence of gunpowder. The Court did not, however, state that evidence of this test is scientifically unreliable when introduced to prove the presence of *nitrates*.

Given the difficulty of this case, and what defendant had confidentially revealed, the trial court did not err by concluding that defendant failed to rebut the presumption that counsel's strategy concerning the nitrate test was effective. On the contrary, we find all of counsel's stated concerns at the *Ginther* hearing to be reasonable and well-founded. As the United States Supreme Court explained in *Strickland*, 466 US at 690-691:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations *or to make a reasonable decision that makes particular investigations unnecessary*. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.
>
> *The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.* In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. [Emphasis added.]

In light of what counsel knew and the circumstances of the case, any reasonably competent attorney might have reached the same conclusion, deciding that it was better to minimize evidence of the nitrate test—and offer post-hoc criticism of it as irrelevant during closing arguments—rather than run the risk of doing the opposite: underlining its importance by frequent objection and motions to strike. As our Supreme Court has recognized, "there are times when it is better not to object and draw attention to an improper comment." *People v Bahoda*, 448 Mich 261, 287; 531 NW2d 659 (1995); see also *Unger*, 278 Mich App at 253 ("Declining to raise objections can often be consistent with sound trial strategy.").

Moreover, it was reasonable for counsel to fear that, had he moved to exclude such evidence, the prosecution might have called expert witnesses to support its admission and reliability, or it might have performed additional forensic testing. On this record—even as augmented by the *Ginther* hearing—defendant has not shown that these concerns were unreasonable. Although the defense expert testified that, once a sample is subjected to the nitrate test, more conclusive forensic tests for gunshot residue cannot be performed on that *same* sample, defendant has presented no evidence that additional samples were not collected that might have been subjected to the more conclusive tests described by the expert. Defendant developed no record on that point at the *Ginther* hearing. Thus, defendant has not rebutted the presumption that his trial counsel's strategic decisions concerning the nitrate-test evidence were sound.

-4-

Furthermore, as this Court noted in *Randolph I*, slip op at 10, even assuming, arguendo, that counsel performed ineffectively by failing to move to exclude this evidence or to strike improper testimony about it, defendant has failed to demonstrate any reasonable probability of a different outcome but for counsel's failure to do so. The prosecution witnesses who testified concerning the nitrate test were never qualified as experts, and on cross-examination, defense counsel highlighted the fact that those witnesses had no training or expertise regarding the nitrate test. Defense counsel also used the nitrate-test evidence to defendant's benefit, arguing that the jury should infer, from the fact that defendant was released despite the results, both that the test was meaningless and that the prosecution's reliance on such irrelevant evidence demonstrated that its case against defendant was weak.

We now turn to defendant's argument that trial counsel should have raised a hearsay objection to testimony by Linda Wilkerson regarding threats made by defendant. Initially, we note that defendant's purported threats were not hearsay—they qualified as admissions by a party opponent under MRE 801(d)(2)—and thus any objection to them on hearsay grounds would have been futile. See *People v Pipes*, 475 Mich 267, 280 n 45; 715 NW2d 290 (2006). Defendant contends, however, that his trial counsel should have objected to testimony that reiterated out-of-court statements made by people *other* than defendant *about* defendant's threats.

As discussed in *Randolph I*, unpub op at 4, one such instance occurred during Linda Wilkerson's testimony:

> Linda Wilkerson, Miller's sister, lived with [the victim] and Miller. She arrived at the home less than an hour before the shooting. [The victim] was visiting with a friend. After [the victim's] friend left, [the victim] told Wilkerson that defendant had "been calling all day threaten' [sic] to kill the family, especially Lo [Wilkerson's son] and Vontay [the victim's nephew]." The prosecutor admits that [the victim's] statement to Wilkerson was hearsay, but the parties dispute whether the evidence was admissible as an excited utterance under MRE 803(2).

For two principal reasons, defendant's claim of ineffective assistance concerning Wilkerson's testimony necessarily fails.

The first is premised on the fact that, although the prosecution concedes that Wilkerson's testimony was hearsay, this Court is not bound by the prosecution's legal interpretations or potential concessions of error. See *People v Perry*, 317 Mich App 589, 601; 895 NW2d 216 (2016), lv den 500 Mich 1009 (2017) ("The prosecution . . . concedes error. However, we are not beholden to the prosecution's concession and conclude that the plain language of the statute permits multiple convictions"); see also *People v Metamora Water Serv, Inc*, 276 Mich App 376, 385; 741 NW2d 61 (2007) (observing that stipulations of law are not binding on courts).

The parties are correct that Wilkerson's challenged testimony, which repeated the victim's out-of-court statements about defendant's threats against her, was hearsay *if* it was offered to prove the truth of the matter asserted (i.e., that defendant actually made such threats). See *People v Kowalak*, 215 Mich App 554, 556-560; 546 NW2d 681 (1996). But the testimony

at issue here was also admissible for a proper *non*hearsay purpose: its effect on the listener. See *People v Gaines*, 306 Mich App 289, 306-307; 856 NW2d 222 (2014) ("An out-of-court statement introduced to show its effect on a listener, as opposed to proving the truth of the matter asserted, does not constitute hearsay under MRE 801(c)."). Specifically, Wilkerson's testimony was used to explain why—despite her presence in the victim's home—Wilkerson did not witness the drive-by shooting or see the victim's fatal wounding.[6] Because Wilkerson's testimony was admissible to explain the effect of the victim's out-of-court statements on Wilkerson's subsequent actions, any objection to it on hearsay grounds would have been futile unless supported by a contemporaneous request for a limiting instruction (i.e., an instruction that the jury could not consider Wilkerson's challenged testimony as proof that defendant actually made threats). Counsel does not perform ineffectively by refusing to raise a futile objection. *Gaines*, 306 Mich App at 302 n 8.

Moreover, because defendant has failed to recognize that Wilkerson's challenged testimony about the victim's statements was admissible for the purpose of proving its effect on the listener, he has not argued that his trial counsel performed ineffectively by failing to move for a limiting instruction. By failing to brief that issue, defendant has waived it. See *People v Kean*, 204 Mich App 533, 536; 516 NW2d 128 (1994).

Secondly, despite his opportunity to do so at the *Ginther* hearing, defendant has failed to carry his burden of developing a record that supports the factual predicate of his instant claim of ineffective assistance. In particular, he failed to develop the necessary record for this Court to decide whether Wilkerson's challenged testimony would have been admissible under the "excited utterance" exception, MRE 803(2) ("A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.").

"The Supreme Court has set forth three criteria that must be met before a statement can be admitted into evidence as an excited utterance. First, the statement must arise out of a startling event; second, it must be made before there has been time for contrivance or misrepresentation by the declarant; and third, it must relate to the circumstances of the startling event." *People v Kowalak*, 215 Mich App 554, 557; 546 NW2d 681 (1996). "[T]he trial court may consider all the circumstances bearing on spontaneity and lack of deliberation in determining whether a declaration comes within the excited utterance exception. There can be no definite and fixed limit of time in determining whether a declaration comes within the excited utterance exception." *Id*. at 559 (quotation marks and citations omitted).

---

[6] Wilkerson explained that after the victim convinced Wilkerson that defendant had threatened to kill both women and their family members, Wilkerson left the living room—where the victim remained—and went to a back bedroom to call her children and warn them about defendant's threats. As Wilkerson spoke with her daughter, she heard gunfire and realized that the shots were being fired into the victim's house. By the time that Wilkerson got back to the living room, the victim had already been fatally shot.

As this Court recognized in *Kowalak*, "[i]t is hard to conceive of a more startling (or terrifying) event with which one might be confronted than a serious death threat." *Id*. at 558. As a parent, a threat against the lives of one's children is arguably even more terrible and startling. And such threats are likely yet more startling if they are made by a man, such as defendant, who has boasted in the past about owning a gun, has made violent threats in the past, and has recently committed a brutal domestic assault against the threatened individual's daughter.

For purposes of this claim of error, defendant did not materially supplement the record at the *Ginther* hearing. He failed to subpoena Wilkerson to uncover what further testimony she might have offered on this point—at trial—had defense counsel interposed a hearsay objection. As a consequence, certain vitally important facts remain unclear, particularly whether the victim said anything to Wilkerson about how *recent* defendant's last threatening call was. Indeed, after reviewing Wilkerson's pertinent testimony, it is unclear whether the last threatening call was received before or *after* Wilkerson arrived. Wilkerson testified that the victim stated that defendant had been "calling all day" and making threats, but she was never asked to clarify if the victim specified *when* he had called. Thus, it is possible that the last threatening phone call took place almost immediately before the victim told Wilkerson about it. Consequently, even assuming that counsel performed ineffectively by failing to object to Wilkerson's challenged testimony on hearsay grounds, defendant has failed to carry his burden of establishing a record that permits this Court to determine whether such an objection might have been successful. Accordingly, defendant's instant claim of error necessarily fails. Without producing a record that permits this Court to determine whether a hearsay objection might have been successful, defendant cannot satisfy the second prong of *Strickland*, demonstrating a reasonable probability that counsel's failure to pose such an objection affected the outcome of the trial.

Defendant also argues that the trial court erred when it held that counsel did not perform ineffectively by failing to object, on hearsay grounds, to Detective-Sergeant Valencia Jones's testimony. In particular, defendant contends that counsel should have objected to Jones's testimony that, during the homicide investigation in this case, the victim's "family had stated that the defendant had left several threatening messages on their answering machine." Again, defendant fails to recognize that such testimony was admissible for a proper nonhearsay purpose. It was used to explain why Jones subsequently accessed the victim's answering machine, listened to its contents (which she described to the jury), and recorded one of the messages (which was subsequently played for the jury and admitted into evidence). The challenged testimony was also part of the foundation to admit this audio recording. Thus, any objection on hearsay grounds would have been futile unless supported by a contemporaneous request for a limiting instruction. Because defendant has not briefed the issue of whether counsel performed ineffectively by failing to request such a limiting instruction, he has waived that issue. See *Kean*, 204 Mich App at 536.

Moreover, defendant again failed, at the *Ginther* hearing, to develop a sufficient record for this Court to determine whether Detective-Sergeant Jones's challenged testimony might have been substantively admissible under a hearsay exception. Notably, when viewed in context, Jones's testimony suggests that the statements in question were made to the police by the victim's family members *shortly after the victim was killed in a drive-by shooting*. Hence, the statements in question might have been admissible as an excited utterance—the shooting up of one's home and the sudden, violent death of a loved one are certainly "startling" events.

-7-

However, defendant developed no new relevant evidence on this point at the *Ginther* hearing, failing to call Detective-Sergeant Jones as a witness. Consequently, it remains unclear who made the out-of-court statements in question, when they were made, and whether the declarant (or declarants) might have been acting under the stress of a startling event at that time. This claim of ineffective assistance therefore merits no relief. Without producing a record that permits this Court to determine whether a hearsay objection might have been successful, defendant cannot demonstrate a reasonable probability that counsel's failure to object affected the outcome of his trial.

Next, defendant argues that trial counsel was ineffective for failing to move to suppress evidence of the guns and ammunition. Specifically, he argues that the guns were found in connection with defendant's arrest, which was based upon ammunition found at defendant's father's house in defendant's belongings pursuant to a search conducted without a warrant under consent granted by defendant's father. This ignores the fact that ammunition was found in his father's house not only in defendant's bags but also in a bedroom. Defendant offers no argument that he would have had standing to challenge the .38-caliber ammunition that was found in the bedroom, nor does he explain why that ammunition does not constitute an independent basis—completely separate from the challenged search of his bags—that justified the later actions taken by the government, including the issuance of a warrant for defendant's arrest.

In any event, even assuming, for the sake of argument, that his father did *not* have apparent authority to authorize a search of defendant's bags, defendant has failed to develop a sufficient record for this Court to accurately determine whether he had a reasonable expectation of privacy in the contents of those bags. As this Court recently explained in *People v Mead (On Remand)*, 320 Mich App 613, 622; 908 NW2d 555 (2017):

> A warrantless search of abandoned property does not violate the Fourth Amendment. Fourth Amendment protections apply only when a person has an expectation of privacy in the searched property. By definition, a person lacks an expectation of privacy in abandoned property. A person is considered to have abandoned property when he voluntarily discarded, left behind, or otherwise relinquished his interest in the property so that he could no longer retain a reasonable expectation of privacy in the property at the time of the search. For example, a person abandons a bag when he discards it while running from the police. [Quotation marks and citations omitted.]

In a given case, whether a reasonable expectation of privacy exists involves "a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" *California v Ciraolo*, 476 US 207, 211; 106 S Ct 1809; 90 L Ed 2d 210 (1986) (emphasis added).

In this case, the record—even as supplemented by the *Ginther* hearing—is not sufficient to answer the first part of this inquiry. Defendant testified neither at trial nor at the *Ginther* hearing. As a result, there is no explicit evidence that he had a subjective expectation of privacy in the bags or their contents. Nor do his actions implicitly suggest such an expectation. On the contrary, the fact that defendant left his bags unattended at his girlfriend Kanisha's house—after he had just physically assaulted her—strongly suggests that he lacked any subjective expectation

of privacy. In any event, because there is no evidence that he had a subjective expectation that the contents of his bags would remain private after he left them and failed, on a timely basis, to come back and retrieve them, defendant cannot satisfy the second prong of *Strickland* here. He cannot demonstrate that there is a reasonable probability that a motion to suppress based on the search of the bags would have been successful, and without showing that it might have been successful, he cannot demonstrate a reasonable probability that counsel's failure to make such a motion affected the outcome of the trial.

Moreover, even if there were some circumstantial evidence that defendant had a subjective expectation of privacy in his abandoned bags, he cannot demonstrate that that expectation was *objectively* reasonable. Put in the plainest terms, defendant's argument depends on his presupposition that after beating Kanisha up, then fleeing from her house (and leaving his bags behind in his haste to avoid the police), it was objectively reasonable for him to expect that those bags and their contents would be left where he had placed them, undisturbed. As a matter of common sense, this is simply not so. Even if defendant had no reason to believe that the police might search his bags upon arriving at Kanisha's residence, a reasonable individual in his position would have every reason to suspect that, enraged by his conduct, Kanisha might subsequently dispose of those bags, destroy or sell their contents, intentionally expose their inculpatory contents to law enforcement, or throw them from a nearby rooftop.[7] After abandoning his bags under these circumstances, it was not reasonable for defendant to believe that he would nevertheless retain some right to privacy concerning their contents.

In light of our conclusion that defendant has failed to demonstrate that a motion to suppress the initial fruits of the search of his bags (i.e., the ammunition found in them) would have been successful, it necessarily follows that he has also failed to demonstrate that a motion to suppress the fruits of the ammunition (particularly the murder weapon) would have been successful. Accordingly, we need not analyze that issue further. In sum, defendant's instant claim of ineffective assistance is meritless. He has failed to demonstrate that a motion to suppress any of the evidence in question would have been successful, and thus he cannot carry his burden of proving either prong of the *Strickland* test.

Finally, we turn to defendant's argument that trial counsel was ineffective for failing to move to exclude the evidence of the ammunition under MRE 404(b). At the *Ginther* hearing, defense counsel explained that he did not object to the introduction of the ammunition under MRE 404(b) because he believed that its introduction was beneficial to the defense. Specifically, counsel used the fact that such ammunition did not fit the murder weapon to argue that someone else, not defendant, had been the shooter—after all, if the nine-millimeter murder weapon was defendant's, why had he been carrying around .357 ammunition the day before the shooting? Additionally, in light of the potential utility of such evidence for the defense, counsel was unconcerned about the propensity-to-commit implications attendant to the introduction of additional evidence of defendant's criminal background, given that one of the charges against

---

[7] Indeed, the bags had been transferred from the house to defendant's father's house by Kanisha's mother (the victim) and her mother's partner.

defendant was felon in possession of a firearm. Thus, the prejudice to defendant was relatively limited, in counsel's view, while the exculpatory value of the ammunition was relatively high.

In our opinion, defendant has failed to rebut the presumption that counsel's strategic decision in this regard was sound. From the fact that—the day before the shooting—defendant was in possession of ammunition that could not be fired by the nine-millimeter murder weapon, counsel was able to sow seeds that might have sprouted reasonable doubt in the minds of rational jurors. Admittedly, it was a calculated risk—the jurors might also have drawn an improper propensity inference. But this was a difficult case, and calculated risks are often necessary to prevail in such cases. See *Unger*, 278 Mich App at 242. The ultimate failure of counsel's chosen strategy does not transform it into one that fell outside the wide range of potentially reasonable strategies. See *People v Kevorkian*, 248 Mich App 373, 414-415; 639 NW2d 291 (2001). For those reasons, we conclude that defendant has failed to rebut the presumption that counsel's strategic decisions concerning the "other acts" evidence were effective.

For the above reasons, we conclude that defendant has failed to establish his claims of ineffective assistance of counsel under the *Strickland* test.

Affirmed.

/s/ David H. Sawyer
/s/ Christopher M. Murray
/s/ Kirsten Frank Kelly