# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

RODNEY DARRELL PERRY,

      Defendant-Appellant.

FOR PUBLICATION
October 27, 2016
9:00 a.m.

No. 328409
Muskegon Circuit Court
LC No. 15-065924-FH

Before: K. F. KELLY, P.J., and O'CONNELL and BOONSTRA, JJ.

PER CURIAM.

A jury convicted defendant of two counts of uttering counterfeit notes, MCL 750.253; one count of false pretenses of $1,000 or more but less than $20,000, MCL 750.218(4)(a); and, one count of identity theft, MCL 445.65. Defendant was sentenced as a second-offense habitual offender, MCL 769.10, to three concurrent prison terms of two to seven and a half years and one term of 12 months in jail. Defendant now appeals as of right. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS

This appeal arises out of the exchange of counterfeit money during a Craigslist transaction, and the background facts involve the fraudulent cashing of a check in Grand Rapids, Michigan.

On July 27, 2014, Montay Lee participated in a basketball tournament in South Haven, Michigan, at which time his bag containing a variety of items, including his wallet, identification, and a $1,100 paycheck from the city of Grand Rapids, was stolen. That same day, defendant cashed Lee's stolen check at Hall Street Party Store in Grand Rapids, Michigan. Wasif Hermiz, the owner of the party store, testified that defendant showed him Lee's identification when cashing the check. Additionally, because defendant was a new customer and because the check was for a higher amount, Hermiz took defendant's thumbprint and had him put it on the back of the check.

Michael Bourdon, the victim in the instant case, posted for sale a 1998 Pontiac Firebird on Craigslist for $2,500. On or around August 8, 2014, defendant and defendant's "mechanic," Marcus Lavar Smith test drove the Firebird. Defendant agreed to the $2,500 purchase price and handed Bourdon an envelope consisting of a $100 bill, several $50 bills, and approximately $150

-1-

to $200 worth of $10 bills. In exchange for the money, Bourdon filled out the title work, indicating that the purchaser was "Montay Lee."

Bourdon's co-worker, Jordan Sohasky testified that he witnessed the transaction. After defendant and the mechanic left, both Bourdon and Sohasky noted that the money looked funny. Bourdon determined that there were no holograms on some of the bills and Sohasky noticed that the bills were too thick. Bourdon immediately called the police. A police officer accompanied Bourdon to Comerica Bank where it was determined that all of the money was counterfeit except for a $100 bill. The Firebird was entered into Law Enforcement Information Network as stolen.

A few hours later, defendant and another individual went to the Secretary of State's Office in Grand Rapids, Michigan. A worker testified that the individuals wanted to transfer a vehicle title and change an address. The worker first changed the address and put a change of address sticker on the back of a Michigan license, which displayed the name "Montay Lee." The worker saw that the vehicle was identified as stolen. He went back into his office to contact the police and the individuals left before he returned. The Firebird was found approximately half of a mile away from the Secretary of State's office.

In an interview with police, defendant admitted to passing a check at the Hall Street Party Store, but that "somebody" offered him money to cash the check and that he did not know that the check was stolen. Defendant had no knowledge of passing any counterfeit money in Muskegon County and denied being part of that transaction. There was no physical evidence connecting defendant to the counterfeit money.

The jury found defendant guilty of identity theft, two counts of uttering counterfeit notes, and one count of false pretenses. Defendant was sentenced as outlined above. He now appeals as of right.

## II. AMENDMENT OF INFORMATION

Defendant argues that the trial court erred by permitting the prosecution to amend the information to add a count of identity theft during trial because (1) the amendment was an unfair surprise and (2) the product of prosecutorial vindictiveness. We disagree.

This Court reviews for an abuse of discretion the trial court's decision to grant or deny a motion to amend an information. *People v McGee*, 258 Mich App 683, 686-687; 672 NW2d 191 (2003). The trial court abuses its discretion when its decision falls outside range of principled outcomes. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012).

First, defendant contends that the amendment to the information during the ongoing trial was an unfair surprise and unduly prejudicial because it denied him the opportunity to cross-examine witnesses on the charges. A trial court may amend an information at any point before, during, or after a trial, as long as the amendment does not unfairly surprise or prejudice the defendant. *McGee*, 258 Mich App at 686; MCR 6.112. A defendant may establish unfair surprise by articulating how additional time to prepare would have benefitted the defense. See *id*. at 693.

In this case, the prosecution stated on the morning before trial that she intended to move to amend the information to add a charge of identity theft for defendant's use of Lee's information when he attempted to purchase the car from Bourdon if the facts at trial supported it. On the second day of trial, over defense counsel's objection, the trial court granted the prosecution's motion to amend the information to include the additional charge. The trial court found that the charge was not a surprise because it involved facts that were already presented and that defense counsel "has known about the threat for a while." Because defendant knew of the prosecution's intent to amend the charges in this case before trial started, he has not demonstrated that the amendment during the trial itself denied him the opportunity to cross-examine the witnesses on the new charge. Defendant was aware of the possibility of identity theft charges before the witnesses were examined.

Second, defendant contends that the amendment was a result of prosecutorial vindictiveness and a punishment for his decision to exercise his right to a trial. The prosecution violates a defendant's right to due process by punishing a person for asserting protected statutory or constitutional rights. *People v Ryan*, 451 Mich 30, 35; 545 NW2d 612 (1996). However, the imposition of additional charges that are within the prosecution's charging discretion is not sufficient evidence from which to presume vindictiveness. *People v Jones*, 252 Mich App 1, 8; 650 NW2d 717 (2002). If the prosecution brings greater charges after a defendant's failure to plead guilty, "the defendant must affirmatively prove actual vindictiveness in order to establish a denial of due process." *Id*. Actual vindictiveness requires objective evidence of hostility or a threat that suggests that the defendant was deliberately penalized for exercising his or her rights. *Ryan*, 451 Mich at 36.

In this case, defendant relies on the timing of the prosecution's decision to seek an additional charge as evidence that the prosecution's decision was vindictive. This is not evidence of presumptive vindictiveness. See *Jones*, 252 Mich App at 8. The record contains no indications of active vindictiveness on the part of the prosecution. It is absent of any expressed hostility or threats that would suggest the prosecution deliberately penalized defendant for exercising his right to a trial. We conclude that the trial court did not err by granting the prosecution's motion to amend the information in this case.

III. PHOTOGRAPHIC LINEUP

Defendant argues that the trial court should have suppressed the evidence of his identification in the photographic lineup because he was in custody at that time and should have received a corporeal lineup with counsel. We disagree.

"This Court reviews de novo questions of law relevant to a motion to suppress [an identification]." *People v Hickman*, 470 Mich 602, 605; 684 NW2d 267 (2004).

At trial, defendant argued that he was denied the right to counsel because he was in custody and adversarial criminal proceedings were initiated against him when the photographic lineup occurred. Defendant further argued that the Kent County case for which he was in custody was related and intertwined; thus, the right to counsel attached upon his arrest on September 22, 2014. Defendant noted that the Kent County case was not initiated until the Grand Rapids Police Department was informed that a bad check was cashed in their jurisdiction.

Defendant argued that police could have easily determined that defendant had been arrested and was in custody. The trial court disagreed and denied defendant's motion to suppress.

On appeal, defendant relies on *People v Anderson*, 389 Mich 155; 205 NW2d 461 (1973), overruled by *People v Hickman*, 470 Mich 602; 684 NW2d 267 (2004), arguing that the trial court erred and that he was entitled to a corporeal identification with counsel instead of a photographic identification procedure. In *Anderson*, the Michigan Supreme Court ruled that when a suspect is in custody, investigators should not use a photographic identification procedure, and that a defendant has as much right to counsel during a photographic identification as he or she would during a corporeal identification. *Anderson*, 389 Mich at 186-187. But the Michigan Supreme Court subsequently overruled *Anderson*, stating that a defendant's right to counsel "attaches only to corporeal identification conducted at or after the initiation of adversarial judicial proceedings." *Hickman*, 470 Mich at 607. See *Moore v Illinois*, 434 US 220, 226-227; 98 S Ct 458; 54 L Ed 2d 424 (1977). Although the *Hickman* decision was made in the context of a corporeal identification, the decision broadly overruled *Anderson* to the extent that the *Anderson* decision went "*beyond the constitutional text* and extend[ed] the right to counsel to a time before the initiation of adversarial criminal proceedings," and it also explained the consistency between the federal and state provisions providing the right to counsel. *Hickman*, 470 Mich at 603-604, 607-609. Thus, applying *Hickman*'s reasoning to photographic identifications that occurred before the initiation of adversarial judicial proceedings is consistent with the *Hickman* decision.

Defendant was taken into custody on September 22, 2014, in the Kent County case, and it appears that the photographic lineup occurred on September 25, 2014. Defendant does not dispute that adversarial judicial criminal proceedings for the instant case had not yet been initiated when the photographic lineup occurred. Because adversarial judicial criminal proceedings for the instant case were not initiated when the photographic lineup occurred, defendant did not have a right to counsel—even under Michigan law. *Hickman*, 470 Mich at 603-604, 607-609 (holding that the right to counsel attaches at or after the initiation of adversarial judicial proceedings and that the protections under the Michigan Constitution were consistent with the Sixth Amendment right to counsel); *People v Smielewski*, 214 Mich App 55, 60; 542 NW2d 293 (1995) (explaining that "[t]he Sixth Amendment right [to counsel], *which is offense-specific* and cannot be invoked once for all future prosecutions, attaches only at or after adversarial judicial proceedings have been initiated") (emphasis added).

Nevertheless, defendant argues that he has a right to counsel under *People v Kurylczyk*, 443 Mich 289; 505 NW2d 528 (1993) because he was in custody. However, *Kurylczyk* was decided before *Hickman*, *Kurylczyk*'s reasoning was based on *Anderson*, see *Kurylczyk*, 443 Mich at 297-298, and *Hickman* held that *Anderson* was overruled to the extent that it went "*beyond the constitutional text* and extend[ed] the right to counsel to a time before the initiation of adversarial criminal proceedings," *Hickman*, 470 Mich at 603-604. Thus, although the *Hickman* decision did not expressly overrule—or even mention *Kurylczyk* in the majority opinion—the *Hickman* decision applies equally to *Kurylczyk*. Accordingly, defendant's reliance on *Kurylczyk* for the proposition that he was entitled to counsel because he was in custody is misplaced.

IV. SUFFICIENCY OF THE EVIDENCE

Defendant argues that the evidence was insufficient to support his conviction of identity theft. We disagree.

This Court reviews de novo a defendant's challenge to the sufficiency of the evidence supporting his or her conviction. *People v Henderson*, 306 Mich App 1, 8; 854 NW2d 234 (2014). We review the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could find that the prosecution proved crime's elements beyond a reasonable doubt. *Id*. at 9.

In pertinent part, MCL 445.65(1) prohibits a person from using the identifying information of another person to obtain property with the intent to defraud or violate the law. MCL 445.65(1)(a)(*i*). Identifying information includes "a person's name, address, telephone number, driver license or state personal identification card number . . ." MCL 445.63(q). Circumstantial evidence and reasonable inferences arising from that evidence can sufficiently prove the elements of a crime, including the defendant's state of mind, knowledge, or intent. *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008).

In this case, Bourdon testified that defendant identified himself as "Montay Lee" and presented Lee's driver's license when Bourdon was filling out the car's title information. Defendant presented the identification simultaneously with counterfeit money. Accordingly, a rational jury could find beyond a reasonable doubt that defendant used Lee's name and license with the intent to defraud Bourdon or, at the very least, an intent to violate the law.

Defendant contends that he did not actually defraud Bourdon with Lee's stolen identification because Bourdon was not overly concerned with defendant's name and the identification did not influence his decision to sell the car. Defendant seeks to add an element to the crime that does not exist. Nothing in the language of MCL 445.65(1) requires the victim to be actually defrauded by the defendant's use of the identifying information.

We conclude that sufficient evidence supported defendant's conviction of identity theft.

## V. DOUBLE JEOPARDY

Finally, defendant argues that his conviction of two counts of passing counterfeit bills violated his right against double jeopardy. We disagree.

Generally, "[a] challenge under the double jeopardy clauses of the federal and state constitutions presents a question of law that this Court reviews de novo." *People v Calloway*, 469 Mich 448, 450; 671 NW2d 733 (2003). However, because defendant's issue is unpreserved, this Court reviews the issue for plain error affecting his substantial rights. *Carines*, 460 Mich at 763.

Defendant was convicted of two counts of uttering counterfeit notes under MCL 750.253, which provides:

> Any person who shall utter or pass, or tender in payment as true, any such false, altered, forged or counterfeit note, certificate or bill of credit for any debt of this state, or any of its political subdivisions or municipalities, any bank bill or

promissory note, payable to the bearer thereof, or to the order of any person, issued as aforesaid, knowing the same to be false, altered, forged or counterfeit, with intent to injure or defraud as aforesaid, shall be guilty of a felony, punishable by imprisonment of not more than 5 years or by fine of not more than 2,500 dollars.

At trial, the prosecutor argued to the jury: "[W]e have 40 bills here. Any one of them could satisfy a count; all right? Two is just the magic number that was picked. We could be as high as 40, but that's not what we're lookin' at . . .."

On appeal, defendant argues that there is nothing in the language of the statute clearly expressing a legislative intent to permit a separate charge for every counterfeit bill that is used to defraud where multiple bills are used within a single transaction. Accordingly, defendant argues that the "unit of prosecution" for a violation of the statute is the number of *transactions* using counterfeit currency, and not the number of counterfeit *bills* used in a single transaction. The prosecution, citing the rule of lenity, concedes error. However, we are not beholden to the prosecutor's concession and conclude that the plain language of the statute permits multiple convictions for uttering multiple notes during only one transaction. Given the plain reading of the statute, the rule of lenity is inapplicable.

At the outset, we note that, contrary to the prosecution's argument on appeal that the "unit of prosecution" theory "has nothing to do with the Double Jeopardy Clause," this Court has reviewed "unit of prosecution" issues in the context of double jeopardy. See, e.g., *People v Barber*, 255 Mich App 288, 293; 659 NW2d 674 (2003) (analyzing the defendant's three convictions of arsons in a double jeopardy context and noting that "[t]he 'unit of prosecution' has been applied in other contexts to determine whether multiple punishments violate double jeopardy principles"); see also *People v Wakeford*, 418 Mich 95, 103-104; 341 NW2d 68 (1983) (explaining that "[u]nder Michigan law, the defendant's two sentences for his armed robbery convictions constitute separate punishments even though the sentences are to be served concurrently. Therefore, the critical inquiry is whether the punishments were imposed for the 'same offense' ").

"Both the United States and the Michigan constitutions protect a defendant from being placed twice in jeopardy, or subject to multiple punishments, for the same offense." *McGee*, 280 Mich App at 682, citing US Const, Am V; Const 1963, art 1, § 15; *People v Smith*, 478 Mich 292, 299; 733 NW2d 351 (2007). "The state and federal constitutional guarantees are substantially identical and should be similarly construed." *People v Ackah-Essien*, 311 Mich App 13, 31; 874 NW2d 172 (2015). "The prohibition against double jeopardy provides three related protections: (1) it protects against a second prosecution for the same offense after acquittal; (2) it protects against a second prosecution for the same offense after conviction; and (3) it protects against multiple punishments for the same offense." *People v Nutt*, 469 Mich 565, 574; 677 NW2d 1 (2004). "To determine whether a defendant has been subjected to multiple punishments for the 'same offense,' [this Court] must first look to determine whether the Legislature expressed a clear intention that multiple punishments be imposed." *People v Garland*, 286 Mich App 1, 4; 777 NW2d 732 (2009). If "the Legislature clearly intends to impose such multiple punishments, there is no double jeopardy violation." *Id*.; see also *People v Miller*, 498 Mich 13, 17-18; 869 NW2d 204 (2015) (explaining that double jeopardy analysis

under the multiple punishment strand is controlled by the parameters set forth by the Legislature and that there is no double jeopardy violation where the Legislature specifically authorizes multiple punishments). When the dispositive question is whether the Legislature intended two convictions to result from a single statute, it presents a "unit of prosecution" issue. *People v Wakeford*, 418 Mich 95, 111; 341 NW2d 68 (1983). The question is whether the Legislature intended a single criminal transaction to give rise to multiple convictions. *Id.* at 112.

When analyzing a statute to determine what unit of prosecution the Legislature intended, this Court and our Supreme Court have focused on various aspects of the statutory text. In *Barber*, 255 Mich App at 295, this Court focused on the harm that the statutory text intended to prevent when it held that there was no double jeopardy violation because the arson statutes aimed "to prevent the burning of a dwelling, building, or other real property" and each separate house was the proper unit of prosecution. See also *People v Mathews*, 197 Mich App 143, 145; 494 NW2d 764 (1992) (finding that the statutory language of the felonious driving statute "suggest[ed] that its primary purpose is the protection of individuals from crippling injuries" and holding that "there is one unit of prosecution that arises whenever a defendant's reckless driving results in a crippling injury to another"). In *Wakeford*, 418 Mich at 111-112, the Court focused on the statutory text's reference to the victim in the singular and on the purpose of the statute. In that case, the Court noted that the statutory text for the armed robbery statute consistently referred to the victim in the singular and that protecting people was the primary purpose of the statute and held that "the appropriate 'unit of prosecution' for armed robbery is the person assaulted and robbed." But see *id*. at 112 (explaining that "[t]he majority rule appears to be that the theft of several items at the same time and place constitutes a single larceny").

Here, while defendant argues that one transaction or exchange of counterfeit bills occurred and, therefore, only one count of uttering and publishing occurred, this approach was specifically disavowed in *Wakeford* when the Court wrote: "To the extent certain language in [various cases] suggests that the critical test is whether the defendant committed 'one single wrongful act', we specifically disavow that test. It is up to the Legislature, not this Court, to determine what constitutes a single offense." *Wakeford*, 418 Mich at 111. Thus, the determination of this issue requires analyzing the statutory text to determine the intent of the Legislature.

The main goal of statutory interpretation is to ascertain and give effect to the Legislature's intent. *People v Peltola*, 489 Mich 174, 181; 803 NW2d 140 (2011). And, "[t]he most reliable indicator of the Legislature's intent is the words in the statute." *Id*. The words are interpreted "in light of their ordinary meaning and their context within the statute and [are] read [] harmoniously to give effect to the statute as a whole." *Id*. "If the language is clear and unambiguous, the plain meaning of the statute reflects the legislative intent and judicial construction is not permitted." *People v Giovannini*, 271 Mich App 409, 412-413; 722 NW2d 237 (2006). However, " '[i]f no conclusive evidence of legislative intent can be discerned, the rule of lenity requires the conclusion that separate punishments were not intended.' " *People v Ford*, 262 Mich App 443, 450; 687 NW2d 119 (2004), quoting *People v Robideau*, 419 Mich 458, 487-488; 355 NW2d 592 (1984), overruled by *People v Smith*, 478 Mich 292; 733 NW2d 351 (2007); see also *People v Gardner*, 482 Mich 41, 50 n 12; 753 NW2d 78 (2008) ("A provision is not ambiguous just because reasonable minds can differ regarding the meaning of the provision. Rather, a provision of the law is ambiguous only if it irreconcilably conflict[s]

with another provision, or when it is equally susceptible to more than a single meaning.") (quotation marks and citation omitted).

Turning again to the statute at issue, MCL 750.253 prohibits any person from uttering or passing, or tendering in payment as true "*any* such false, altered, forged or counterfeit *note*" with the intent to defraud. (Emphasis added.) As the prosecution notes, the statute refers to bank bill or note in the singular, but MCL 8.3b provides:

> Every word importing the singular number only may extend to and embrace the plural number, and every word importing the plural number may be applied and limited to the singular number. Every word importing the masculine gender only may extend and be applied to females as well as males.

Still, MCL 8.3b does not render MCL 750.253 ambiguous. In this particular case, the clear purpose of MCL 750.253 is to punish the use of counterfeit money to obtain property, but using counterfeit money to deceive a seller is just one evil the statute addresses. We hold that the clear intent of the statute, as expressed by the legislature's use of the singular "note," is to address placing counterfeit and false bills into the stream of commerce. Not only was Bourdon deceived into turning over property in exchange for counterfeit money, but 40 counterfeit bills were now part of the stream of commerce and had the potential to impact and harm others. For example, had Bourdon not called the police and investigated whether the money was counterfeit, he may have used those bills at various times to make various purchases. The harm as contemplated in the statute is the placing of false money into the public commerce. The statutory text of MCL 750.253 evidences the Legislature's intent to punish a defendant for each counterfeit bill that was introduced uttered, passed, or tendered because the text reflects an intent to prevent counterfeit bills from being used. Given the clear indication of legislative intent and the absence of ambiguity, the rule of lenity does not apply. *Wakeford*, 418 Mich 113-114.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Peter D. O'Connell
/s/ Mark T. Boonstra

-8-