*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

RANDALL RAYMOND BALL,

        Defendant-Appellant.

UNPUBLISHED
March 19, 2019

No. 340019
Shiawassee Circuit Court
LC No. 2017-009489-FH

Before: SAWYER, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

Defendant, Randall Raymond Ball, appeals as of right his jury conviction of aggravated stalking, MCL 750.411i. The trial court departed from the recommended minimum guidelines range of 14 to 58 months and sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to serve 20 to 30 years in prison. We affirm.

## I. BACKGROUND AND PROCEDURAL HISTORY

The victim, a 21-year-old cosmetologist, testified that she first met defendant in December 2016 when he entered the salon where she worked as a walk-in customer and she gave him a haircut. Defendant returned a week later to get the haircut "fixed," and he also returned for another haircut in January. Subsequently, defendant began contacting the victim for noncommercial purposes, including showing her photos, inviting her to accompany him to Walmart, approaching her while she was shopping, and leaving a note on the victim's car outside of the salon. The note referenced not only where the victim lived, but also the route she took home, although the victim had not shared these details with defendant. The note also encouraged the victim to call him. When her employer told the victim that there was nothing the salon could do, she contacted the police, who in turn contacted defendant at the phone number indicated in the note. Defendant subsequently admitted to each of these contacts.

Prior to trial, the trial court considered the proposed admission of other-acts evidence concerning defendant's behavior at two other similar businesses. Relevant to this appeal, the trial court permitted the prosecution to present evidence of a note that defendant left on the car of a patron at a tanning salon in 2008 after breaking into the car; however, the trial court would not

-1-

allow admission of the note itself or references to the fact that it included a threat to rape the recipient. Nevertheless, in defendant's first trial, the recipient of the 2008 note testified that the note defendant left in her car was "sexually threatening." Defendant moved for a mistrial. The prosecution conceded that it believed this characterization of the note was appropriate under the trial court's order. The trial court denied defendant's motion and struck the testifying witness's entire testimony. Subsequently, the prosecution "joined" defendant's motion for a mistrial, and the trial court granted a mistrial only after defendant expressed consent to mistrial and to a retrial.

Defendant subsequently moved to bar retrial based on prosecutorial misconduct in goading defendant to seek a mistrial, but the trial court found that the prosecutor's conduct was at best negligent and denied defendant's motion. On retrial, the owner of the tanning salon testified that defendant had left a "sexually threatening" note on a patron's car. The witness admitted that it was her error. The trial court denied defendant's motion for a mistrial, instead instructing the jury to disregard the witness's response.

The jury found defendant guilty of aggravated stalking and the trial court subsequently sentenced defendant to 20 to 30 years' imprisonment.

## II. DOUBLE JEOPARDY

Defendant first argues that the constitutional protection against double jeopardy should have prevented a retrial after defendant's first trial ended in a mistrial caused by prosecutorial misconduct. This argument lacks merit.

"A double-jeopardy challenge presents a question of constitutional law that this Court reviews de novo." *People v Ream*, 481 Mich 223, 226; 750 NW2d 536 (2008). Further, this Court reviews issues of prosecutorial misconduct de novo "to determine whether the defendant was denied a fair and impartial trial." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010) (quotation marks and citations omitted). A trial court's factual findings pertaining to whether the prosecutor sought to goad a defendant into seeking a mistrial are reviewed for clear error. *People v Dawson*, 431 Mich 234, 258; 427 NW2d 886 (1988). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made." *People v Mullen*, 282 Mich App 14, 22; 762 NW2d 170 (2008).

The Michigan Constitution and the Fifth Amendment of the United States Constitution protect a criminal defendant from being placed twice in jeopardy for a single offense. *People v Booker (After Remand)*, 208 Mich App 163, 172; 527 NW2d 42 (1994), citing *Dawson*, 431 Mich at 250. See US Const, Am V; Const 1963, art 1, § 15. Michigan's double-jeopardy provision was intended to be "construed consistently with Michigan precedent and the Fifth Amendment." *People v Szalma*, 487 Mich 708, 715-716; 790 NW2d 662 (2010) (quotation marks and citation omitted). However, the Double Jeopardy Clauses will not typically serve as a bar to retrial when a defendant requests, or consents to, a mistrial; under those circumstances, the defendant's actions are viewed as having waived a resulting double jeopardy claim. *Dawson*, 431 Mich at 253. Further, "[w]here a mistrial results from apparently innocent or even negligent prosecutorial error, or from factors beyond his control, the public interest in allowing a retrial

outweighs the double jeopardy bar." *Id.* at 257. Rather, retrial is only barred if, based on the objective facts and circumstances, the trial court finds that "the prosecutor intended to goad defendant into moving for a mistrial." *Id.*

Relevant to the case at hand, retrial following a mistrial is permitted when the defendant requests or consents to the declaration of a mistrial. *People v Lett*, 466 Mich 206, 214; 644 NW2d 743 (2002). But it is not permitted when "the prosecutor has engaged in conduct intended to provoke or 'goad' the mistrial request." *Id.*; see also *Dawson*, 431 Mich at 253 ("Where a defendant's motion for mistrial is prompted by intentional prosecutorial misconduct, . . . the defendant may not, by moving for a mistrial, have waived double jeopardy protection."). Accordingly, prosecutorial misconduct standing alone is insufficient to trigger double jeopardy protections; the prosecutor must have intended to push the defendant into a corner leaving mistrial as the only escape. *Oregon v Kennedy*, 456 US 667; 102 S Ct 2083; 72 L Ed 2d 416 (1982). In determining the prosecution's intent, the trial court should rely on "the objective facts and circumstances of the particular case." *Dawson*, 431 Mich at 257.

As recognized by our Supreme Court, "[t]he 'goad the defendant into moving for a mistrial' standard 'calls for a finding of fact by the court . . . , an inquiry for which the trial court is best suited.' " *Dawson*, 431 Mich at 258 n 57, quoting *United States v Posner*, 764 F2d 1535, 1539 (CA 11, 1985) (ellipsis in original). In this case, subsequent to the trial court's grant of a mistrial, defendant filed a motion for an evidentiary hearing and argued that retrial was barred by the prosecutorial misconduct. Following a hearing on the matter, the trial court explained that retrial was not barred because the mistrial was not caused by the prosecutor's intentional misconduct. The trial court indicated that the evidence did not support a finding that the prosecutor "intended to subvert the Double Jeopardy Clause," but that the prosecutor believed the witness's statements were within the scope of the court's order. The trial court found that the prosecutor's conduct was negligent. Furthermore, the trial court noted that defendant "freely and voluntarily" agreed to be retried, "and not on the basis on any goading by the People."

We agree that in this case, there is no evidence that the prosecution's request to join the first motion for retrial goaded defendant into requesting a mistrial. As previously discussed, the trial court inquired of defendant whether he was requesting a mistrial, and defendant stated his express agreement to a mistrial and a retrial. Furthermore, defendant confirmed that he was not threatened or coerced into making the request. Defendant's agreement to a retrial affirmatively waived any double-jeopardy arguments against retrial, thus extinguishing appellate objections. See *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) ("One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error.") (quotation marks and citation omitted). However, even if this issue had not been affirmatively waived by defendant, it would not warrant appellate relief because the prosecutor's conduct was negligent, but not intentional.

Defendant also argues that the prosecutor acknowledged during the retrial that prosecutorial misconduct caused the first mistrial. Defendant argues that on this basis, defense counsel's initial motion for a mistrial was erroneously denied. Defendant suggests that this improper denial resulted in defendant's consent for retrial and that his agreement and consent to a retrial should therefore be disregarded. Specifically, defendant points to the prosecutor's statement that "this [sic] exactly the same issue that gave arise [sic] to our prior mistrial;

however, there, that was prosecutorial misconduct." However, we note that the prosecutor quickly clarified, "Not intentional, but with the assumption that that term could be used." Accordingly, the statements by the prosecutor only admit the same negligent conduct by the prosecutor already considered by the trial court and do not support a finding that the trial court erred by denying defendant's original motion for a mistrial.

## III. INSUFFICIENCY OF THE EVIDENCE

Next, defendant argues that insufficient evidence was presented to prove that defendant committed aggravated stalking as defined in MCL 750.411i because defendant did not know that his contacts were nonconsensual and the victim never asked him to stop contact. Furthermore, defendant argues that he never threatened the victim. Defendant's arguments are misplaced.

This Court reviews de novo a defendant's challenge to the sufficiency of the evidence. *People v Perry*, 317 Mich App 589, 599; 895 NW2d 216 (2016). The evidence is reviewed in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt. *Id*. In reviewing the sufficiency of the evidence, this Court must not interfere with the jury's role as the trier of fact. *People v Hardiman*, 466 Mich 417, 431; 646 NW2d 158 (2002).

"Aggravated stalking" involves stalking and an additional aggravating factor such as a previous conviction for stalking. MCL 750.411i(2)(d). MCL 750.411i(1)(e) defines "stalking" as "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested." "Harassment" is defined in MCL 750.411h(1)(c) as "conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress." As used in the definition of "harassment," "unconsented contact" is defined to mean "any contact with another individual *that is initiated or continued without that individual's consent* or in disregard of that individual's expressed desire that the contact be avoided or discontinued." MCL 750.411h(1)(e) (emphasis added). Unconsented contact includes, but is not limited to:

(*i*) Following or appearing within the sight of that individual.

(*ii*) Approaching or confronting that individual in a public place or on private property.

(*iii*) *Appearing at that individual's workplace or residence.*

(*iv*) Entering onto or remaining on property owned, leased, or occupied by that individual.

(*v*) Contacting that individual by telephone.

(*vi*) Sending mail or electronic communications to that individual.

> (*vii*) *Placing an object on, or delivering an object to, property owned, leased, or occupied by that individual.* [*Id*. (emphasis added).]

There must be evidence of two or more acts of unconsented contact that caused the victim to suffer emotional distress and that would cause a reasonable person to suffer emotional distress. MCL 750.411h(1)(a); *Hayford v Hayford*, 279 Mich App 324, 330; 760 NW2d 503 (2008). " 'Emotional distress' means significant mental suffering or distress that may, but does not necessarily, require medical or other professional treatment or counseling." MCL 750.411h(1)(b).

It is undisputed that defendant's contacts as a paying customer of the salon are not at issue in this case. However, the victim also testified concerning three other instances where defendant initiated contact outside of the patron-client relationship. She testified that in January 2017, defendant came into the salon near closing time when she was alone to show her a picture on his phone of a salon that shared her same first name and inquire whether she had moved. This caused the victim to become concerned. About a week later, defendant returned near closing time, when she was alone again, and offered her money to go with him to Walmart. The victim informed him that she was not interested, and defendant left. However, at that point, the victim was terrified. Defendant returned about another week later with the same offer, and the victim once again declined. On one of these occasions, after closing the shop, the victim was in the makeup aisle at Walmart when defendant approached her with an empty cart. She described the encounter as "nerve-racking."

Lastly, on Valentine's Day, the victim went out with a coworker after work and found a note on her car when she returned to the salon's parking lot. The victim became concerned that an older man was taking such interest in her and became "terrified and frightened." The note referenced the victim's home. However, the victim testified, while she and defendant had exchanged "small talk," she never volunteered where she lived or what kind of car she drove. The victim testified that, since receiving the note, she was "terrified to go to places by [herself]," she attended therapy, and it was hard for her to be around people. She also no longer closed the store by herself.

As noted above, "unconsented contact" includes two categories of contact—1) contact that is initiated or continued without that individual's consent, or 2) contact that is in disregard of that individual's expressed desire that the contact be avoided or discontinued. MCL 750.411h(1)(e). Defendant's unconsented contacts with the victim at her workplace and by means of placing a note on her car fall within the categories of unconsented contacts specifically identified by the Legislature. MCL 750.411h(1)(e)(*iii*) and (*vii*).

Further, the victim's testimony also supports a finding that there were two or more acts of unconsented contact that caused her to suffer emotional distress. That defendant didn't threaten the victim is not dispositive of whether she suffered emotional distress. Rather, the statute requires only that a reasonable person feel terrorized, frightened, intimidated, threatened, harassed, or molested, and that the victim felt terrorized, frightened, intimidated, threatened, harassed, or molested. MCL 750.411i(e). As noted above, the victim testified that she felt "terrified and frightened" by defendant's contacts. Viewed from a totality-of-circumstances perspective, these contacts would cause a reasonable person to suffer emotional distress. See

-5-

MCL 750.411h(1)(a). As a whole, the evidence, when viewed in a light most favorable to the prosecution, would justify a rational jury's finding that defendant willfully engaged in aggravated stalking. See *Perry*, 317 Mich App at 599.

## IV. EVIDENCE OF OTHER ACTS

Defendant argues that the trial court abused its discretion when it allowed evidence of the 2008 conduct because the conduct was not similar in nature, in that the note left on this victim's car was not threatening. Defendant additionally argues that the trial court abused its discretion in admitting evidence that he was being electronically monitored by tether when he drove by the victim's home. We disagree.

"The admissibility of other acts evidence is within the trial court's discretion and will be reversed on appeal only when there has been a clear abuse of discretion." *People v Waclawski*, 286 Mich App 634, 670; 780 NW2d 321 (2009). "A court abuses its discretion when it chooses an outcome that is outside the range of reasonable and principled outcomes." *People v Orr*, 275 Mich App 587, 588-589; 739 NW2d 385 (2007). "The determination whether the probative value of evidence is substantially outweighed by its prejudicial effect is best left to a contemporaneous assessment of the presentation, credibility, and effect of the testimony." *Waclawski*, 286 Mich App at 670.

Even if properly preserved, error in the admission of bad-acts evidence does not require reversal unless it affirmatively appears that it is more probable than not that the error was outcome determinative. *People v Knapp*, 244 Mich App 361, 378; 624 NW2d 227 (2001). The defendant bears the burden of establishing that, more probably than not, a miscarriage of justice occurred. *Id.*

"Generally, character evidence cannot be used to show that a defendant acted in conformity therewith because there is a danger that a defendant will be convicted solely on his history of misconduct rather than on his conduct in a particular case." *People v Henry*, 315 Mich App 130, 140; 889 NW2d 1 (2016). Use of bad acts as evidence of character is excluded, except as allowed by MRE 404(b), to avoid the danger of conviction based on a defendant's history of misconduct. *People v Johnigan*, 265 Mich App 463, 465; 696 NW2d 724 (2005). MRE 404(b) generally governs the admission of evidence of bad acts. It provides, in relevant part:

> (1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

"MRE 404(b) does not prohibit all other-acts evidence that may give rise to an inference about the defendant's character, but only that which is relevant solely to the defendant's character or criminal propensity." *People v Jackson*, 498 Mich 246, 276; 869 NW2d 253 (2015) (quotation marks and citation omitted). Other-acts evidence is admissible under MRE 404(b) if: "(1) it is offered for a proper purpose, (2) it is relevant, and (3) its probative value is not substantially

outweighed by its potential for unfair prejudice." *Henry*, 315 Mich App at 140-141. Furthermore, evidence is not subject to MRE 404(b) analysis merely because it discloses a bad act; bad acts can be relevant as substantive evidence, admissible under MRE 401, without regard to MRE 404. *People v Houston*, 261 Mich App 463, 468-469; 683 NW2d 192 (2004). The list of exceptions in MRE 404(b) is nonexclusive. *People v Engelman*, 434 Mich 204, 212; 453 NW2d 656 (1990).

To be admissible under MRE 404(b), bad-acts evidence generally (1) must be offered for a proper purpose, (2) must be relevant, and (3) must not have a probative value substantially outweighed by its potential for unfair prejudice. *People v Knox*, 469 Mich 502, 509; 674 NW2d 366 (2004). A proper purpose is one other than establishing the defendant's character and propensity to commit the offense. *Johnigan*, 265 Mich App at 465. The prosecutor bears the burden of establishing relevance. *People v Mardlin*, 487 Mich 609, 615; 790 NW2d 607 (2010). The trial court must closely scrutinize the logical relationship between the evidence and the fact in issue. *Orr*, 275 Mich App at 589. Evidence of misconduct similar to that charged is logically relevant to show that the charged act occurred if the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they were manifestations of a common plan, scheme, or system. *People v Dobek*, 274 Mich App 58, 90; 732 NW2d 546 (2007).

In this case, prior to trial, the prosecution provided notice of its intent to use evidence of defendant's movements as recorded by his GPS tether. Furthermore, the prosecution filed a notice of intent to introduce 404(b) evidence. Defendant objected. Following a hearing, the trial court held the evidence that defendant was on a tether was admissible; however, any mention of the reason for the tether or mention of defendant's parole status was excluded. The testifying agent was also prohibited from testifying that he worked for the Department of Corrections. Furthermore, limiting instructions were to be submitted by the parties to instruct the jury that it was not to speculate as to the reason for the tether, but rather only consider it as evidence that defendant drove past the victim's home. The trial court also required any reports to be redacted to exclude defendant's parole status and sex offender registration status. Additionally, the trial court indicated that defendant's handwritten note in the prior case was relevant to show a common scheme, but the note was not itself admissible. The trial court disallowed use of the contents of the letter; however, the note could be described as "threatening."

A witness who worked at a tanning salon testified that in February 2017 she noticed an individual parked outside the salon several times and eventually contacted the police. The responding officer testified that he was dispatched to the tanning salon and that the vehicle at issue was occupied by defendant. Defendant informed the officer that he had been to the salon to tan but "he couldn't find his membership card to go tanning, and that's why he didn't go in." However, the tanning salon owner testified that defendant tanned at the salon only once, in 2016, and did not have a tanning membership. Further, she testified that no membership cards were issued to customers.

Another tanning salon worker testified that in 2008 she noticed defendant sitting in his car outside that salon more than two dozen times. One day a note was left on a customer's car, which caused her to contact the police. The tanning salon worker testified that she made a police report, and defendant was identified and interviewed, but never detained. The tanning salon

manager also confirmed that she was made aware of by her employees and witnessed a suspicious vehicle in the parking lot; however, she could not identify the driver.

The tanning salon customer testified that in July 2008, someone got into her car and left a note in it while she frequented the tanning salon. The note was threatening in nature, and the police were called. The assigned detective identified the driver as defendant. At the time of his identification, defendant had a pocket knife in his possession. An inventory search of his vehicle also revealed binoculars, handcuffs, bleach, work gloves, and two axes.

Relevant to the present case, the agent responsible for monitoring defendant's GPS tether testified that defendant traveled at approximately 14 miles per hour by the victim's house in January 2017 and had been in the parking lot at the hair salon 52 times, for varying amounts of time, between December 14, 2016 and February 14, 2017.

Defendant's argument essentially ignores the multiple similarities between defendant's prior conduct and the charged offense. Witnesses from both the 2008 and 2017 incidents reported that defendant was repeatedly parked in the parking lot of these businesses. GPS tracking corroborated that the same circumstances occurred in this case. These events occurred outside of businesses related to the beauty industry. The complainants in these prior incidents were either employees or patrons of the businesses. Accordingly, the GPS information was relevant in establishing that defendant also repeatedly frequented the parking lot in this case.

Further, like the present case, the 2008 incident also involved a note being left on or in a vehicle. While the threatening message in the 2008 note was more direct, the note left for defendant's most recent victim contained threatening undertones because it suggested that defendant knew not only which vehicle the victim drove, but also where she lived and which route she took home. In whole, the letter implied that defendant was surveilling the victim. Therefore, the GPS data confirming that defendant drove by the victim's home was relevant to show that it was more probable than not that defendant had personal knowledge of the victim's home address. Accordingly, the trial court did not err in determining that there were sufficient similarities between the other-acts evidence and the charged offense and that the evidence was logically relevant to show that defendant operated under a common plan, scheme, or system. *Dobek*, 274 Mich App at 90.

Defendant also contends that the evidence should have been excluded pursuant to MRE 403 because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. Aside from defendant's conclusion that "the evidence was clearly more prejudicial than probative," defendant does not elaborate on how the trial court failed to apply the principles set forth in MRE 403. This Court is not required to unravel and elaborate on defendant's arguments and may deem the argument waived. *People v Cameron*, 319 Mich App, 215, 232; 900 NW2d 658 (2017). Nonetheless, defendant's argument is not persuasive. Rather, by prohibiting references to the contents of the 2008 note and defendant's parole status, the trial court ensured that the probative value of the evidence substantially outweighed its potential for unfair prejudice. See *Knox*, 469 Mich at 509.

Further, defendant argues that the admission of the evidence resulted in a miscarriage of justice because the facts of the case did not support a finding that defendant committed the crime

of aggravated stalking. Rather, defendant suggests that the jury based its verdict on the other-acts evidence. However, as discussed above, the victim's testimony about her contacts with defendant were alone sufficient to justify a rational jury's finding that defendant willfully engaged in aggravated stalking. Accordingly, the trial court did not err in admitting the evidence of defendant's prior acts and the GPS tether information.

## V. OV 10

Defendant asserts that the trial court improperly assessed 15 points under OV 10, MCL 777.40 (exploitation of vulnerable victim), because there was no evidence that he engaged in predatory conduct or that the victim was vulnerable. Defendant's assertion fails.

The proper interpretation and application of the sentencing guidelines is a legal question that this Court reviews de novo. *People v Morson*, 471 Mich 248, 255; 685 NW2d 203 (2004). "Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation which an appellate court reviews de novo." *Id*.

"When calculating the sentencing guidelines, a court may consider all record evidence, including the contents of a PSIR, plea admissions, and testimony presented at a preliminary examination." *People v McChester*, 310 Mich App 354, 358; 873 NW2d 646 (2015). When reviewing the record evidence, a trial court may make "reasonable inferences arising from the record evidence to sustain the scoring of an offense variable." *People v Earl*, 297 Mich App 104, 109; 822 NW2d 271 (2012).

MCL 777.40(1)(a) provides that 15 points are to be scored for exploitation of a vulnerable victim if predatory conduct was involved. "Predatory conduct" is defined, in part, as "preoffense conduct directed at a victim . . . for the primary purpose of victimization." MCL 777.40(3)(a). Predatory conduct "must have occurred before the commission of the offense." *People v Cannon*, 481 Mich 152, 160; 749 NW2d 257 (2008). In *Cannon*, our Supreme Court held that the following three questions must be answered in the affirmative before OV 10 may be scored at 15 points:

> (1) Did the offender engage in conduct before the commission of the offense?
>
> (2) Was this conduct directed at one or more specific victims who suffered from a readily apparent susceptibility to injury, physical restraint, persuasion, or temptation?
>
> (3) Was victimization the offender's primary purpose for engaging in the preoffense conduct? [*Id*. at 162.]

Predatory conduct need not be directed at a particular victim, but can extend to conduct directed at "a victim," for instance, by a defendant lying in wait or stalking members of the community at large. *People v Huston*, 489 Mich 451, 459-462; 802 NW2d 261 (2011). Further, "a defendant's

'predatory conduct,' by that conduct alone, can create or enhance a victim's 'vulnerability.' " *Huston*, 498 Mich at 454.

The evidence in this case showed that defendant spent considerable time over a short period in the parking lot of the hair salon where the victim worked. Specifically, defendant had been in the parking lot 52 times, for varying amounts of time, between December 14, 2016 and February 14, 2017. On one occasion, defendant came into the salon without an appointment for the ostensible purpose of showing the victim pictures on his phone. On two other occasions, defendant also tried to coax the victim into accompanying him to Walmart. Two of these incidents occurred when the victim was alone in the salon, and two occurred near closing time when it was dark outside. On yet another occasion, defendant actually approached the victim while she was shopping in the makeup aisle at Walmart after work.

Further, the evidence showed that defendant drove by the victim's home on one occasion. Moreover, the note left on the victim's car referenced not only where she lived, but the route she took to drive home, notwithstanding that the victim had never told defendant what kind of car she drove or where she lived. Defendant's conduct was directed toward a specific victim, who was made vulnerable by defendant's attempts to isolate her. This conduct was predatory in nature and satisfies the standards for scoring 15 points for OV 10.

## VI. PROPORTIONALITY

Lastly, defendant argues that the upward departure sentence imposed by the trial court is unreasonable and disproportionate. We disagree.

This Court reviews an upward departure from the sentencing guidelines range for reasonableness. *People v Lockridge*, 498 Mich 358, 365; 870 NW2d 502 (2015). The proper inquiry for this Court when reviewing a departure sentence for reasonableness is whether the trial court abused its discretion by violating the principle of proportionality. *People v Steanhouse*, 500 Mich 453, 477; 902 NW2d 327 (2017) (*Steanhouse II*). The trial court abuses its discretion if it violates the principle of proportionality "by failing to provide adequate reasons for the extent of the departure sentence imposed . . . ." *Id*. at 476.

When imposing a sentence, a court is required to consult the sentencing guidelines, calculate the recommended sentencing guidelines sentence range, and take that range into account when determining a defendant's sentence. *Lockridge*, 498 Mich at 391-392. However, the court is not compelled to impose a minimum sentence within the calculated range. *Id*. at 365. The sentencing guidelines are advisory only. *Id*. at 392.

A sentence that departs from the recommended guidelines range may be imposed when the trial court determines that the recommended range is disproportionate to the seriousness of the crime. *People v Steanhouse (On Remand)*, 322 Mich App 233, 238; 911 NW2d 253 (2017) (*Steanhouse III*). The Michigan Supreme Court, in *Steanhouse II*, 500 Mich at 471, has reaffirmed the principle of proportionality test articulated in *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990). That is,

> a judge helps to fulfill the overall legislative scheme of criminal punishment by taking care to assure that the sentences imposed across the discretionary range are

proportionate to the seriousness of the matters that come before the court for sentencing. In making this assessment, the judge, of course, must take into account the nature of the offense and the background of the offender. [*Milbourn*, 435 Mich at 651.]

The sentencing court must also consult and account for the guidelines, which " 'remain a highly relevant consideration in a trial court's exercise of sentencing discretion.' " *Steanhouse II*, 500 Mich at 474-475, quoting *Lockridge*, 498 Mich at 391.

In implementing the principle of proportionality, " 'the key test is whether the sentence is proportionate to the seriousness of the matter, not whether it departs from or adheres to the guidelines' recommended range.' " *Steanhouse II*, 500 Mich at 472, quoting *Milbourn*, 435 Mich at 661. The *Steanhouse II* Court expressly distinguished the test from one requiring " 'extraordinary' circumstances to justify a sentence outside the Guidelines range." *Steanhouse II*, 500 Mich at 473-474, quoting *Gall v United States*, 552 US 38, 47; 128 S Ct 586; 169 L Ed 2d 445 (2007). The principle of proportionality test does not create a presumption of unreasonableness for sentences that deviate from the guidelines range. *Steanhouse II*, 500 Mich at 474. Factors that may be considered under the test include, but are not limited to:

(1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation. [*People v Steanhouse*, 313 Mich App 1, 46; 880 NW2d 297 (2015) (*Steanhouse I*), aff'd in part and rev'd in part on other grounds 500 Mich 453 (2017) (citations omitted).]

As partial justification of its departure sentence, the court expressed its concerns with the seriousness of defendant's predatory actions. The court stated:

This is a case, Mr. Ball, in this Court's opinion, of hunter stalking prey.

The evidence establishes that you have a pattern of locating and targeting your women who work in customer service positions, that you make multiple unwanted contacts, that you surveil them while they're working, and that you leave threatening notes in their vehicles.

The trial court further noted that defendant was on parole, registered as a sex offender, and on a GPS monitoring at the time of the offense, but none of those factors deterred defendant's conduct. The trial court determined that "the guidelines do not account for the fact that you stalked this victim relentlessly on a nearly daily basis for approximately two months."

As an additional basis for its departure, the court also noted that defendant clearly had not learned from his prior incarceration and attempts at rehabilitation. The court cited defendant's significant history of criminal convictions. In determining an appropriate sentence, a court may draw inferences about the defendant's behavior from the objective evidence. *People v Petri*, 279

Mich App 407, 422; 760 NW2d 882 (2008). The court "must take into account the nature of the offense and the background of the offender." *Milbourn*, 435 Mich at 651.

Defendant had a history of sexual assaults and stalking that resulted in prior incarceration and counseling. The PSIR indicated that in 1991 defendant was charged with four separate instances of fourth-degree criminal sexual conduct. For about two years, defendant participated in treatment at Auburn Counseling. Defendant was charged with window peeping in 1994, for which he served 90 days in jail. He was convicted of misdemeanor stalking in 1996. He failed to comply with the Sex Offender Registration Act and was sentenced to serve 40 to 180 months in prison in 2008. His nonconsensual interactions with this victim began in January 2017. Testimony at trial established that defendant was contemporaneously displaying the same stalking behaviors outside of a tanning salon. Courts may consider uncharged offenses and pending charges in sentencing. *People v Coulter (After Remand)*, 205 Mich App 453, 456; 517 NW2d 827 (1994). The trial court properly considered defendant's lengthy history of misconduct and his failure to rehabilitate. See *Steanhouse III*, 322 Mich App at 242.

Further, the trial court also expressed a need to adequately protect society. The need to protect others is a factor not adequately considered by the guidelines. See *People v Armstrong*, 247 Mich App 423, 425; 636 NW2d 785 (2001). The court indicated that "[the court] must fashion a sentence that focuses on the protection of society." The trial judge stated that the sentence imposed would incapacitate defendant so that he would be "unable to commit crimes for a very long time." Defendant's criminal history supports the trial court's conclusion that defendant presented a significant threat to other women. Given defendant's failed rehabilitation, the court was justified in its concerns for the safety of other women and society.

Considering the record as a whole, the trial court identified several reasons for departure that were not adequately considered by the guidelines. Therefore, the trial court did not abuse its discretion when it determined that a sentence outside the sentencing guidelines range was warranted. See *Steanhouse I*, 313 Mich App at 46.

Further, the trial court's reasons for the extent of the departure sentence are clear and the sentence rendered satisfied the principle of proportionality. See *People v Smith*, 482 Mich 292, 304; 754 NW2d 284 (2008); see also *Steanhouse III*, 322 Mich App at 243. Under the sentencing guidelines, defendant's recommended minimum sentence range was 14 to 58 months, but the trial court imposed a minimum sentence of 20 years. The trial court stated, "[A]s applied to the facts and circumstances of this offense and to this offender, the guidelines are overly-simplistic." The court noted that defendant's criminal conduct began in 1980, but starting in 1991, defendant began a "pattern and practice of victimizing women." Since 1991, the court noted, defendant's "conduct towards women has been assaultive, abusive, and predatory." And despite being incarcerated numerous times since 1991, totaling about 14 years of incarceration, defendant had continued to act as a "hunter stalking prey" with respect to his female victims. In fact, defendant was required to be registered as a sex offender, was on parole, and was on GPS tether monitoring when he committed this offense. The court noted defendant's persistent failures to respond to the deterrent effect of several terms of probation and parole, as well as incarceration, and concluded that society needed to be protected on a long term basis from defendant. The court further noted that, although it could impose a life term considering

defendant's habitual fourth offender status, such a sentence "could mean as little as fifteen (15) years." The court stated:

> You've already, approximately, done that much time in the Michigan Department of Corrections and even that hasn't deterred you from continuing to offend.
>
> Given the disastrous results of your current parole or paroles, this Court cannot find that parole eligibility in as little as fifteen (15) years adequately protects the public. The Court doubts that a higher sentence would really have any likelihood of deterring you from committing crimes in the future. However, it is certain that a higher sentence will serve the compelling need to incapacitate you so that you are unable to commit crimes for a very long time.

The trial court adequately explained why the particular upward departure sentence was more proportionate to the nature of the offense and defendant's background than a sentence within the range recommended under the guidelines would have been and we agree with that rationale.

In summary, the trial court properly identified factors that warranted an upward departure from the guidelines minimum sentence range, the reasons for the particular departure sentence are clear, and the extent of the departure sentence satisfied the principle of proportionality. See *Milbourn*, 435 Mich at 659-660.

Affirmed.

/s/ David H. Sawyer
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly