*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
November 17, 2025
2:18 PM

Plaintiff-Appellee,

v

No. 368763

DAVID RICHARD COMMAND,

Wayne Circuit Court
LC No. 20-004448-01-FH

Defendant-Appellant.

Before: GARRETT, P.J., and PATEL and YATES, JJ.

PER CURIAM.

Defendant, David Richard Command, is the biological father of CE and MM. After being absent from their lives during their younger years, Command reconnected with CE and MM in 2019 and developed a relationship with them. At that time, CE was 17 years old and MM was 19 years old. Not long after CE and MM began spending time with Command, they alleged that he engaged in sexual contact and sexual penetration with them. The prosecution charged Command, in separate cases, with fourth-degree criminal sexual conduct (CSC-IV), MCL 750.520e(1)(d) (sexual contact with victim related by blood or affinity to third degree), with respect to CE and two counts of third-degree criminal sexual conduct (CSC-III), MCL 750.520d(1)(d) (sexual penetration with victim related by blood or affinity to third degree), regarding MM.

Following his preliminary examination, the district court bound Command over for trial on the CSC-IV charge involving CE and only one of the CSC-III charges involving MM. The district court dismissed the second CSC-III charge. The two cases were tried together in the circuit court. Command appeals by right his jury-trial conviction of the CSC-III charge involving MM.[1] We conclude that the trial court did not err by declaring MM unavailable and admitting MM's preliminary examination testimony at trial and that this procedure did not deny Command his right to confront MM. We also conclude that Command was not denied the effective assistance of

---

[1] Command's claim of appeal listed the docket number of the CSC-III case only. Although he listed both trial court docket numbers on his brief on appeal, only the CSC-III case is at issue in this appeal, and none of his arguments pertains to the CSC-IV case.

counsel, the prosecutor did not commit prosecutorial error, and evidence involving other sexual assaults, including the dismissed CSC-III charge, was properly admissible under MCL 768.27b. Accordingly, we affirm.

## I. FACTS AND PROCEEDINGS

Command was not involved in CE's and MM's lives during their childhood years. He contacted CE via Facebook in April or May 2019, when CE was 17 years old, and asked her if she wanted him to be a part of her life and wanted to meet his family. CE and Command soon began spending time together, and she met his relatives, including her half-sister, MM.[2] Similar to CE, MM did not have a childhood relationship with Command. MM met him on April 11, 2019, when she was 19 years old, and soon began spending the night at his house at least half of the time.

When MM stayed overnight at Command's house, she usually slept on the couch in the living room, but one night in May 2019, she slept in his bedroom. That night, MM slept in Command's bed while he slept on the floor near his bed. She awoke at 2:00 or 3:00 a.m. to find Command on top of her and vaginally penetrating her with his penis. He was already penetrating her when she awoke, and her t-shirt, bra, jeans, and underwear that she was wearing when she went to bed had been removed. She denied that she was drunk or high when she went to sleep. She tried to push Command off her, but was unable to do so. She also told him "no," but he continued. She recalled that he had a "smirk on his face" and "evil in his eyes." After he ejaculated, he put his clothes on and told her that if she told anyone what had happened, he would "come for [her]." According to MM, Command engaged in the same type of sexual conduct with her on at least five occasions, with the last incident occurring in September 2019 one week before her birthday.

CE also spent the night at Command's house on a few occasions. She slept on the couch in the living room. On the morning of September 14, 2019, Command sat on the couch while she was sleeping, which woke her up. He then began to massage her feet and her legs. He placed his hands under her pant legs to massage her legs and continued to move his hands up her legs until he was massaging her buttocks. He then moved his fingers under her underwear and touched her vagina. CE immediately stood up and exclaimed, "What the f*uck is wrong with you?" She began to collect her belongings and put her things in her bag. Command remarked that he had fallen asleep and handed her a $100 bill. She took the money and left the house. As she walked to her car, Command asked if she was okay to drive, but she ignored him. After she drove away, Command texted her and again stated that he had fallen asleep.

CE drove a few blocks away and called her mother, Sarah VanLante. After telling VanLante what had occurred, CE called MM and told MM what happened. VanLante drove both

---

[2] When the incidents giving rise to this case occurred, and at the time of Command's preliminary examination, MM identified as female. At the time of trial, MM identified as male and was known by a different name. We use the terms "she," "her," "he," and "him" as appropriate when referring to MM during the timeframes relevant to this case. For the sake of consistency, we use the initials "MM" throughout this opinion.

CE and MM to the police station to report Command's conduct. That occurred approximately one week after the final incident between MM and Command. MM provided a written statement to the police and went to a clinic for a medical examination.

As previously stated, the prosecutor charged Command, in separate cases, with one count of CSC-IV involving CE and two counts of CSC-III involving MM. The district court bound Command over for trial on the charge involving CE and the charge involving MM stemming from the May 2019 incident. The district court declined to bind Command over for trial on the charge stemming from the final incident that occurred in September 2019 and dismissed that charge. The two cases were tried together in the circuit court.

On the second day of trial, the prosecutor informed the trial court that MM was experiencing a medical episode in the witness room similar to the episode MM suffered during the preliminary examination. While testifying at the preliminary examination, MM experienced chest pains and had difficultly breathing. She was transported to the hospital via ambulance, and the proceeding was adjourned to a later date when her testimony resumed. After it resumed, MM again began to experience difficulty breathing and requested a water break. The district court took a break and handled another matter before MM continued her testimony, which concluded very shortly thereafter. In the witness room during trial, MM experienced tightening of his chest and difficulty breathing. He also made "aggressive statements" and expressed suicidal ideations. The prosecutor indicated that MM was unable to respond to questions because of his condition and asked that the trial court declare him "unavailable" as a witness so that his preliminary examination testimony could be read at trial in lieu of his live testimony. Defense counsel objected, noting that MM was physically present. The trial court asked to hear from MM.

Outside the jury's presence, the trial court swore in MM and informed him that the court would give him time during his testimony and instruct the attorneys to be respectful during questioning. The court further told him that he could look at the jury, the prosecutor, or anywhere he wanted to look while testifying and request breaks if needed. The court stated that it wanted to make him comfortable. Still outside the jury's presence, MM testified that he felt like his "heart was going to pop" while in the witness room approximately one hour previously. He described feeling like his heart was expanding and thought he was going to suffocate. He further testified that he felt the same sensation previously:

> *Q*. Okay. And have you experienced that before?
>
> *A*. Yes.
>
> *Q*. And what usually happens after you're feeling that?
>
> *A*. I normally—I start to feel shaky. My head, tired, claustrophobic. I start to feel like I'm going into seizure [sic]; just a thing, just get away from me, nothing can touch me.
>
> *Q*. And have you had seizures before from that?
>
> *A*. Yes.

*Q*. Did you, in fact, have a seizure at the preliminary exam when questions were asked to you about certain topics?

*A*. Yes.

*Q*. Okay. And other than the physical feeling that you are feeling in your chest, can you describe what was going through your mind? What, if any, statements were you making about how you were feeling?

*A*. I can't do this. I'm done. Screw this. I'd rather die than be here. I would rather die than be sitting right here.

*Q*. Okay. Did you make any suicide statements?

*A*. Yes.

*Q*. Okay. Are you—can you explain what you are emotionally experiencing when the topics of the assault or the fact that name even of [MM], what does that cause you to feel?

*A*. It causes me rage.

*Q*. Okay. And then what does the rage result in?

*A*. Panic, depression, all the emotions mixed in one.

*Q*. Okay. And then does that panic then lead to something?

*A*. It leads to seizures. It leads to rage. It leads to just not fully being there.

*Q*. Okay. And is that when asked specifically about questions related to the assault?

*A*. Yes.

*Q*. As well as questions related to your former identification as a female?

*A*. Yes.

*Q*. Okay. And can you describe what your reaction, like your actual—other than the tightness of your chest, what was your physical reaction that you were experiencing in that witness room?

*A*. I—I thought I was going to be ripped to shreds. I wanted to vomit. I— just the physical feeling of disgust being violated.

*Q*. So what I mean by that is were you yelling?

*A*. Yes.

-4-

*Q.* When you said you get angry and aggressive, what did that look like?

*A.* It looked like yelling. It looked like just pure aggravation, just not wanting anyone to be near me. I didn't want anyone to speak to me. I wanted to be left alone.

*Q.* Okay. Are you able to testify about what happened to you?

*A.* I cannot.

*Q.* And why is that?

*THE COURT*: The answer's no, correct?

*THE WITNESS*: Yes.

*THE COURT*: Go ahead.

*THE WITNESS*: Just the pain that I'm feeling in my chest right now. It doesn't—it doesn't feel right.

*Q.* (By Ms. Movsisyan [the prosecutor], continuing): Okay. Do you have feel [sic] sick?

*A.* I feel sick.

*Q.* Are you—do you have any concerns of your mental health after testifying?

*A.* Yes.

*Q.* And what concerns are those?

*A.* Being able—being able to just, just, just physically I don't feel okay. I don't—I just—I feel dizzy.

*Q.* Okay. Just take some deep breaths, [MM]. Just take some deep breaths.

*THE COURT*: Do you need to step down? Why don't you step down. You can go to the witness room.

The trial court declined to rule on the issue at that time and proceeded with trial.

Later that day, the trial court revisited the issue of MM's unavailability. The parties and the court discussed relevant caselaw, and the court noted that defense counsel was able to cross-examine MM at the preliminary examination. The court stated that it would address the issue again the following day, but indicated that it did not believe that MM "was faking it." The court noted that MM had difficulty breathing, was shaking, and was holding a fidget toy used to cope with anxiety. The court also noted that MM was unable to answer some of the court's questions.

Both parties agreed that the court accurately described MM's condition while he was on the witness stand that day.

The following day, the trial court asked the parties what the preliminary examination transcript indicated regarding MM. The prosecutor described what occurred and recited statements from the transcript. She then argued that the trial court should declare MM unavailable because of a physical and mental illness as stated in MRE 804(a)(4). She indicated that MM's condition was both mental and physical and that he experienced difficulty breathing, tightness in his chest, and dizziness. The prosecutor also noted that MM was gasping, was very slow to respond to questions, and essentially became unresponsive. MM also stated in the witness room that he "might as well just go outside and kill himself." The prosecutor maintained that the preliminary examination transcript showed what occurs to MM when he "shuts down" and is unable to breathe. She anticipated that MM would have the same reaction in front of the jury if forced to testify at trial.

The trial court swore in the officer in charge, Daniel Bailey, to testify about what he saw at the preliminary examination.[3] He stated that paramedics believed that MM had suffered a seizure. Bailey testified that MM was shaking "and her eyes rolled back in her head on the stand." He ran to the witness stand and grabbed her so that she would not hit her head when she fell.

Regarding Command's Confrontation Clause right to confront MM, the prosecutor argued that defense counsel had an opportunity to cross-examine MM at the preliminary examination and cross-examined MM at length, which satisfied that right. The trial court indicated that if it granted the prosecutor's motion and allowed MM's preliminary examination testimony to be admitted at trial, it would not allow any of the testimony regarding the dismissed charge to be read to the jury.

Defense counsel, Jonathan Jones, disputed that Command's previous attorney had an adequate opportunity to cross-examine MM at the preliminary examination. Jones asserted that, at the preliminary examination stage, most attorneys "do not have everything available to them" and that the district court judge often remarked to Command's previous counsel that the matters he was inquiring about were irrelevant for purposes of a preliminary examination. Jones also argued that MM was able to resume testifying on the second day of the preliminary examination, indicating that "whatever issue took place initially was clearly fixed." In addition, Jones asserted that the prosecutor failed to provide evidentiary proof of MM's condition and that Command would be "stripped" of his right of confrontation if MM did not testify in person. Jones maintained that the jury would be unable to judge MM's character without his in-person testimony. The trial court responded that if it granted the prosecutor's motion, it would allow Jones to argue to the jury that MM was not present to testify. Jones further argued that it seemed contradictory that a person "who's afraid of confrontation" would have the strength to change genders. Jones maintained that "there seem[ed] to be a conflict of wanting to pick and choose" and that caselaw did not allow a person to be declared unavailable because they did not want to testify. The court indicated that it

---

[3] Jurors were not present while Bailey testified.

did not intend to create a precedent in which a person could avoid testifying if they were simply uncomfortable doing so.

The trial court ultimately declared MM unavailable and allowed his preliminary examination testimony to be read at trial . The court reasoned that the fact that MM claimed to be suicidal was insufficient to declare him unavailable. The court stated that it witnessed MM shaking and having difficulty breathing, and MM testified that he suffered a seizure during the preliminary examination, which resulted in him collapsing while testifying. The court remarked that, while on the witness stand the previous day, MM "froze up" and put his head down when the prosecutor began to ask questions. The court remarked that it had never previously observed a witness that mentally incapacitated. The court reiterated that it did not believe that MM was "faking" and that it witnessed MM put his head down and shake. The court stated that if MM had remained on the witness stand, the same situation that occurred during the preliminary examination could have occurred again: "Now what I saw yesterday, I was concerned that that was gonna happen again." Further, the court prohibited the portions of the preliminary examination transcripts regarding the dismissed charge from being read to the jury and allowed the parties to indicate that MM was not present to testify. Finally, the court noted that Command's right of confrontation was not affected because his previous attorney had an opportunity to cross-examine MM at the preliminary examination.

The trial court then proceeded with trial. Command's former girlfriend, AK, testified that she and Command were in a romantic relationship for approximately nine years until it ended in 2013 or 2014. On July 8, 2015, Command entered her home without permission and grabbed a knife from the knife block in the kitchen. He was intoxicated and refused to leave when she asked him to do so. He forced her down the hallway into her bedroom and pushed her onto the bed. He then kissed her and forcibly penetrated her vagina with his penis. She debated trying to use a hanger she was able to grab as a weapon against him, but decided to "let him finish" so that the incident would be over and he would get off her. She did not feel safe and wanted Command to leave her house. She maintained that she did not consent to any sexual contact with him.

Command denied MM's allegations against him. He maintained that he slept in his bedroom with his girlfriend, Francis Ramirez-Huerta, all the time and that MM slept in the living room when she stayed overnight. He denied that MM ever slept in his bedroom. He testified that he was taken into custody on May 10, 2019, and incarcerated for 11 days because of an alcohol tether violation. He was not released from custody until May 21, 2019, and was therefore not home during the alleged incident in May. In addition, he did not recall spending time with MM alone at his house when someone else was not present. Several other witnesses who lived in the home, including Ramirez-Huerta, testified on Command's behalf regarding the sleeping arrangements in the home.

The jury convicted Command of sexually assaulting both CE and MM. This appeal followed.

## II. MM'S TESTIMONY

Command first argues that the trial court erred by declaring MM unavailable and allowing his preliminary examination testimony to be read during trial. Command also asserts that the error

denied him his right to confront MM and tainted the jury. Further, he maintains that Jones rendered ineffective assistance of counsel by failing to object to MM's "improper labeling" as "unavailable." We conclude that the trial court properly determined, over Jones's objection, that MM was "unavailable" within the meaning of MRE 804(4) and that Command was not denied his right to confront MM because his previous attorney cross-examined MM at length during the preliminary examination.

We review for clear error the trial court's factual determination whether a witness is unavailable. *People v Garland*, 286 Mich App 1, 7; 777 NW2d 732 (2009). Clear error exists if we are left with a definite and firm conviction that a mistake was made. *People v Chaney*, 327 Mich App 586, 587 n 1; 935 NW2d 66 (2019). We review for an abuse of discretion the trial court's decision whether to admit evidence, but we review de novo preliminary questions of law regarding the admission of evidence. *People v Duncan*, 494 Mich 713, 722-723; 835 NW2d 399 (2013). An abuse of discretion occurs if the trial court's decision "falls outside the range of principled outcomes." *People v Musser*, 494 Mich 337, 348; 835 NW2d 319 (2013). We review de novo the constitutional question whether a defendant was denied his right to confront the witnesses against him. *People v Butler*, 513 Mich 24, 29; 6 NW3d 54 (2024). Finally, "whether a defendant has been denied effective assistance of counsel is a mixed question of fact and law— the trial court's factual findings supporting its decision are reviewed for clear error, while the court's determination of whether those facts violated the defendant's right to the effective assistance of counsel is reviewed de novo." *People v Haynes*, 338 Mich App 392, 429; 980 NW2d 66 (2021).

Although hearsay is generally inadmissible at trial, the Michigan Rules of Evidence allow certain out-of-court statements to be admitted when a witness is unavailable. *Duncan*, 494 Mich at 717. At the time of trial, MRE 804(b) provided, in relevant part:[4]

The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) Testimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

Regarding unavailability, MRE 804(a) stated, in pertinent part:

"Unavailability as a witness" includes situations in which the declarant—

* * *

---

[4] Our Supreme Court amended the Michigan Rules of Evidence after trial in the instant case. We refer to the provisions of the Rules of Evidence in effect at the time of trial.

(4) is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity . . . .

Command asserts that the trial court erred by declaring MM unavailable because MM did not suffer from a mental infirmity. Rather, Command argues, MM was simply unwilling to testify, "engaged in erratic behavior to attract the prosecution's attention, and utilized suicidal statements to avoid the inconvenience of testifying." Further, Command maintains that *Duncan*, 494 Mich 713, and *People v Haywood*, unpublished per curiam opinion of the Court of Appeals, issued January 2, 2020 (Docket No. 344797),[5] which the parties and the trial court discussed below, are inapplicable to the facts of this case.

*Duncan* involved "RS," a four-year-old criminal sexual conduct victim. Although RS was able to testify at the defendants' preliminary examinations, at trial she struggled to answer preliminary questions, such as whether she knew the difference between the truth and a lie. She responded, "No," had tears in her eyes, and began wringing her hands. After she began to cry, the trial court excused her. *Duncan*, 494 Mich at 717-719. The prosecution moved the court to declare RS unavailable and to admit her preliminary examination testimony under MRE 804(b)(1). The trial court denied the request on the basis that none of the circumstances set forth in MRE 804(a) was applicable. *Id*. at 719-720.

Our Supreme Court held that RS had a then-existing mental infirmity as stated in MRE 804(a)(4). *Id*. at 728. Relying on dictionary definitions, the Court opined that "the phrase 'mental infirmity' as used in MRE 804(a)(4) encompasses weakness or feebleness of the mind—one cause of which may be an individual's age." *Id*. at 726. The Court also determined that the phrase "then existing" indicated that "the mental infirmity need not be permanent, or even longstanding" and that "the only relevant reference point is the point at which the witness takes the stand." *Id*. Further, the Court recognized that children lack the mental maturity expected of adults and may be unable to overcome the distress experienced while attempting to testify. *Id*. at 727. Finally, the Court stated that "whether a witness suffers from a 'then existing mental infirmity' " is a case-specific inquiry. *Id*. 728.

*Haywood* involved a 17-year-old sexual assault victim who was cognitively impaired and performed academically at a first or second-grade level. *Haywood*, unpub op at 1. At the time of trial, the victim was 18 years old. The prosecution moved to have the victim declared unavailable on the basis of her statements and conduct during a pretrial interview. The victim expressed suicidal thoughts, had difficulty answering questions, and took long pauses during which she looked at the ceiling and talked to God or her deceased mother. The victim also told her step-

---

[5] We recognize that *Haywood* is an unpublished opinion and therefore not binding under MCR 7.215(C)(1). We discuss *Haywood* because the trial court relied on that case below, and the parties discuss it in their briefs. In addition, we find *Haywood* persuasive and analogous to the instant case. "Unpublished opinions are not binding, but may be persuasive." *People v Daniels*, 311 Mich App 257, 268 n 4; 874 NW2d 732 (2015).

mother that she wanted to die, she was admitted to the hospital for suicidal ideation approximately one year before trial, and she had been suicidal since the defendant's sexual assaults. *Id*. at 3.

Although the victim had difficulty answering questions at a pretrial evidentiary hearing, she ultimately indicated that she would be able to testify at trial. *Id*. At trial, however, she was unresponsive to some questions, withdrawn, and indicated that she could not remember what happened. *Id*. at 3-4. The prosecution again moved the trial court to declare the victim unavailable. The defendant objected, arguing that doing so would violate his right of confrontation. *Id*. at 3. The court remarked that it did not appear that the victim was simply refusing to testify, but rather, "[t]here's more going on inside of her head there, and you can't get answers out of her." The court further stated, "I don't believe we're going to get any more testimony out of her at this point." *Id*. at 4. The court declared the victim unavailable and admitted her preliminary examination testimony. *Id*. at 2.

This Court affirmed the trial court's decision, comparing the case to *Duncan*. This Court stated:

> Although the victim herein is not a child, like the victim in *Duncan*, she was cognitively impaired and was at a first-grade or second-grade level, much like a child. The victim showed signs of mental infirmity at trial. She became silent and unresponsive to questions; questions had to be repeated by the trial court. Additionally, the trial court was well aware of the victim's recent emotional breakdown, and her expression of suicidal thoughts related to testifying in open court. Against this backdrop, the trial court's conclusion that there was "more going on inside the victim's head" is evidentiarily well-supported, as is the court's conclusion that the victim would not be able to provide more testimony.

> Ultimately, as in *Duncan*, 494 Mich at 729-730, there was evidence that the victim could not overcome her severe emotional distress and give testimony at trial both because she was mentally infirm and emotionally traumatized. Given the victim's cognitive impairment, and the trial court's opportunity to see the victim on the stand, the trial court's finding of unavailability under MRE 804(a)(4) was not clearly erroneous. [*Haywood*, unpub op at 4 (brackets omitted).]

In addition, the *Haywood* Court determined that the trial court did not abuse its discretion by admitting the victim's preliminary examination testimony under MRE 804(b)(1) and that doing so did not violate the defendant's right of confrontation, stating "[D]efense counsel cross-examined the victim at the preliminary examination regarding the charges, and there was a similar motive to develop the victim's testimony." *Id*. at 5.

The trial court in the instant case found *Haywood* much more persuasive than *Duncan*. Similar to *Haywood*, MM voiced suicidal ideations, was unable to answer questions, and exhibited signs of distress. The court determined that MM's distress was genuine and that he was not "faking this." The court observed MM put his head down and shake and feared that he would suffer "the

same type of seizure" that occurred during the preliminary examination if he testified at trial.[6] The court remarked that, arguably, this case is an even stronger case than *Haywood* because the victim in *Haywood* did not suffer the physical manifestation of psychological distress that MM suffered. In addition to MM's visible distress at the time of trial, Bailey, the officer in charge, testified that MM shook at the preliminary examination, and her eyes rolled back in her head while she was on the witness stand.

Command argues that no evidence indicates that MM's distress was related to the sexual assaults and that, instead, MM used his "rage" regarding his transition from female to male and regarding the use of his previous name as an excuse to avoid testifying. Although MM testified outside the jury's presence that the use of his previous name and identification as female caused him "rage," he also testified that the topic of the assaults caused the same reaction, which led to seizures. Command also asserts that MM was able to communicate effectively outside the presence of the jury, indicating that his mental state did not prevent him from testifying. The record shows that MM was able to communicate effectively—when he was able to communicate at all. After MM suffered the medical episode on the first day of the preliminary examination, the proceeding was adjourned and did not resume for approximately seven months. When it resumed, MM was able to testify briefly before she had difficulty breathing and needed to take a break. She again resumed testifying, and the proceeding concluded shortly thereafter. At trial, MM again experienced difficulty breathing while testifying outside the jury's presence. He also experienced chest pain, dizziness, and testified that he felt ill. As previously discussed, the trial court observed MM's condition and remarked that it appeared he would suffer another seizure if he continued to testify.

Therefore, the record supports the trial court's factual determination that MM was unavailable because of a "then existing physical or mental illness or infirmity" as stated in MRE 804(a)(4). We agree with the trial court that MM's illness or infirmity was both mental and physical and that his condition rendered him unable to testify. Command's assertion that MM's unavailability likely confused the jury and compromised its ability to make an informed decision is speculative and has no record support.

Command also contends that the trial court abused its discretion by allowing MM's preliminary examination testimony to be read aloud and that doing so violated his right of confrontation. Because the trial court did not clearly err by finding MM unavailable under MRE 804(a)(4), Command's argument is unavailing. The Confrontation Clause bars the admission of testimonial evidence unless the witness who made the statement at issue is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Crawford v Washington,* 541 US 36, 68; 124 S Ct 1354; 158 L Ed 2d 177 (2004). This Court recognized this principle in *Garland*, 286 Mich App at 7-8, when a sexual assault victim was unable to attend trial because she lived out of state and could not travel to Michigan because of her high-risk pregnancy. We rejected the defendant's argument that the admission of the victim's preliminary examination testimony

---

[6] Although the proper medical term for what MM experienced is unclear from the record, the prosecutor described the medical episode interchangeably as a seizure and an anxiety attack, and MM testified that he experienced a seizure at the preliminary examination.

constituted inadmissible hearsay and violated the defendant's right of confrontation, stating "Former testimony is admissible at trial under both MRE 804(b)(1) and the Confrontation Clause as long as the witness is unavailable for trial and was subject to cross-examination during the prior testimony." *Id*. at 7. The record shows that Command's previous attorney was able to cross-examine MM at length during the preliminary examination before she suffered the medical episode that ended the proceeding that day. Defense counsel was also able to finish his cross-examination of MM on the second day of the preliminary examination and indicated that he had no further questions. Accordingly, the trial court did not abuse its discretion by admitting MM's preliminary examination testimony at trial, and the admission of his prior testimony did not violate Command's right of confrontation.

Finally, Command asserts that Jones rendered ineffective assistance of counsel by failing to object to MM's "improper labeling" as unavailable. The record shows that Jones did object to declaring MM unavailable and strenuously argued against declaring him unavailable. Therefore, the record does not factually support Command's argument.

### III. OTHER-ACTS EVIDENCE

Command next argues that the trial court erred by admitting other-acts evidence involving his former girlfriend, AK. Command failed to preserve his challenge to the admission of AK's testimony regarding the sexual assault because he failed to object to its admission in the trial court. *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014). Under the plain-error rule, a defendant must establish: "(1) an error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the plain error affected substantial rights, i.e., prejudiced defendant by affecting the outcome of the proceedings." *People v Anderson*, 341 Mich App 272, 279; 989 NW2d 832 (2022) (quotation marks and citation omitted). Reversal is warranted only if the plain error "resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Davis*, 509 Mich 52, 67-68; 983 NW2d 325 (2022) (quotation marks and citation omitted). To the extent that Command challenges the admission of AK's testimony that he entered her home without consent and wielded a knife during the sexual assault, he preserved his argument for our review by objecting to that testimony in the trial court. We review for an abuse of discretion preserved claims of error regarding the admission of evidence. *People v Burns*, 494 Mich 104, 110; 832 NW2d 738 (2013).

"The general rule under MRE 404(b) is that evidence of other crimes, wrongs, or acts is inadmissible to prove a propensity to commit such acts." *People v Denson*, 500 Mich 385, 397; 902 NW2d 306 (2017). This evidence, however, may be admissible for nonpropensity purposes. *Id*. at 397-398. At the time of trial, MRE 404(b)(1) provided:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

Evidence is admissible under MRE 404(b) if: (1) it is offered for a proper, nonpropensity purpose as stated in MRE 404(b)(1), (2) it is relevant under MRE 402, as enforced through MRE 104(b), and (3) unfair prejudice does not substantially outweigh the probative value of the evidence. *People v Galloway*, 335 Mich App 629, 638; 967 NW2d 908 (2020).  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  MRE 401.

Unlike MRE 404(b), MCL 768.27b does not prohibit the admission of evidence involving other sexual assaults or domestic violence to establish the defendant's propensity to commit such acts.  *People v Berklund*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367568); slip op at 8.  At the time of trial, MCL 768.27b[7] provided, in relevant part:

> (1) Except as provided in subsection (4), in a criminal action in which the defendant is accused of an offense involving domestic violence or sexual assault, evidence of the defendant's commission of other acts of domestic violence or sexual assault is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403.
>
> * * *
>
> (4) Evidence of an act occurring more than 10 years before the charged offense is inadmissible under this section unless the court determines that 1 or more of the following apply . . . .
>
> * * *
>
> (6) As used in this section:
>
> (a) "Domestic violence" or "offense involving domestic violence" means an occurrence of 1 or more of the following acts by a person that is not an act of self-defense:
>
> (*i*) Causing or attempting to cause physical or mental harm to a family or household member.
>
> (*ii*) Placing a family or household member in fear of physical or mental harm.
>
> (*iii*) Causing or attempting to cause a family or household member to engage in involuntary sexual activity by force, threat of force, or duress.

---

[7] Our Legislature amended MCL 768.27b pursuant to 2024 PA 184, effective April 2, 2025.  We rely on the version of the statute in effect at the time of trial.

(*iv*) Engaging in activity toward a family or household member that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

(b) "Family or household member" means any of the following:

(*i*) A spouse or former spouse.

(*ii*) An individual with whom the person resides or has resided.

(*iii*) An individual with whom the person has or has had a child in common.

(*iv*) An individual with whom the person has or has had a dating relationship.

Command contends that he was acquitted of charges pertaining to the 2015 incident involving AK, but he mischaracterizes what occurred in that case. While trial was ongoing, Command pleaded guilty to one count of assault with a dangerous weapon, and the remaining charges were dismissed. Accordingly, he was not acquitted of the sexual assault charges pertaining to AK.

Command also asserts that AK's testimony included details outside the scope of MRE 404, specifically that he forced entry into her home and used a knife during the incident.[8] Regardless of whether such evidence was admissible under MRE 404(b), because it involved domestic violence, it was admissible under MCL 768.27b. As previously stated, "domestic violence" under MCL 768.27b(6) includes activity directed toward a family or household member that causes physical or mental harm or places that person in fear of such harm. MCL 768.27b(6)(a)(*i*) and (*ii*). "Domestic violence" under the statute also includes forcing a family or household member to engage in involuntary sexual activity using force or threat of force and engaging in activity directed toward a family or household member that would cause a reasonable person to feel frightened. MCL 768.27b(6)(a)(*iii*) and (*iv*). Command's forced entry into her home and use of a weapon constitutes domestic violence under MCL 768.27b(6). In addition, AK is a "family or household member" under the statute because she was previously in a dating relationship with Command and they have a child in common. MCL 768.27b(6)(b)(*iii*) and (*iv*). Further, this Court determined in *Berklund*, ___ Mich App at ___; slip op at 5, that other-acts evidence involving domestic violence is admissible under MCL 768.27b(1) in cases involving sexual assault and that the statute does not limit other-acts evidence involving domestic violence to domestic violence cases or limit other-acts evidence involving sexual assault to sexual assault cases.

The *Berklund* Court also determined that the plain language of MCL 768.27b contained three express limitations. First, under MCL 768.27b(4), the other-acts evidence must not have occurred more than 10 years before the charged offense absent certain enumerated exceptions. *Id*. at ___; slip op at 4. Second, as stated in MCL 768.27b(1), the evidence must not be excluded

---

[8] Contrary to Command's assertion, the trial court did not strike AK's testimony that Command forced his way into her home and grabbed a knife from the knife block in the kitchen.

-14-

under MRE 403.[9] *Id*. at ___; slip op at 4. Third, also as stated in MCL 768.27b(1), the evidence must be relevant. *Id*. at ___; slip op at 4. The conduct involving AK occurred within 10 years before the conduct involving MM. Moreover , the evidence was relevant, and unfair prejudice did not outweigh its probative value. "[E]vidence is unfairly prejudicial when there exists a danger that marginally probative evidence might be given undue weight by the jury." *People v Dixon-Bey*, 321 Mich App 490, 513; 909 NW2d 458 (2017). "[W]hen applying MRE 403 to evidence admissible under MCL 768.27b, courts should weigh the propensity inference in favor of the evidence's probative value rather than its prejudicial effect." *Berklund*, ___ Mich App at ___; slip op at 10.

AK's testimony that Command entered her home without consent and grabbed a knife before forcing her to engage in sexual intercourse lent credibility to MM's claim that he forced her to engage in sexual intercourse. MM testified that she awoke to find Command on top of her and penetrating her vagina with his penis. She told him "no" and tried to push him off her, but was unable to do so. She further testified that he was "enjoying himself" and had a "smirk on his face." Command behaved aggressively toward both victims, and both victims testified that they did not want to engage in sexual activity with him, but were unable to stop him. AK's testimony was not merely marginally probative; rather, it was relevant to the very issue the jury was tasked with deciding—whether MM's allegation was true. Accordingly, the trial court did not err by admitting the evidence.[10]

## IV. DNA EVIDENCE

Command next raises several arguments pertaining to the introduction of DNA evidence regarding the CSC-III charge that the district court dismissed at his preliminary examination. He asserts that the trial court erred by admitting the testimony of Kimberly Hurst, who testified about the evidence. He also challenges the trial court's admission of Hurst's testimony and DNA

---

[9] At the time of trial, MRE 403 provided:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

[10] In his reply brief, Command asserts that Jones rendered ineffective assistance of counsel by failing to object to AK testifying remotely while she was at work, which resulted in interruptions in her testimony because of technical failures. This argument is not properly before us, and we decline to address it. Under MCR 7.212(G), "[w]ithin 21 days after service of an appellee's or cross-appellee's brief, appellant or cross-appellant may file a reply brief *confined to rebuttal of the arguments in the appellee's or cross-appellee's brief*." (Emphasis added.) "Reply briefs must be confined to rebuttal, and a party may not raise new or additional arguments in its reply brief." *Lawrence v Mich Unemployment Ins Agency*, 320 Mich App 422, 443-444; 906 NW2d 482 (2017) (quotation marks and citation omitted). We therefore decline to address Command's challenge to the fact that AK testified remotely as well as his other arguments raised for the first time in his reply brief that are not responsive to the prosecution's arguments raised in its appellee's brief

laboratory reports on Confrontation Clause grounds. In addition, Command argues that Jones rendered ineffective assistance of counsel by failing to object to the DNA evidence. We conclude that all of Command's arguments lack merit.

Hurst testified that she was trained to perform sexual assault examinations on sexual assault patients, including collecting evidence and treating injuries. The trial court qualified her as an expert in forensic examinations. Hurst did not perform the sexual assault examination conducted on MM on September 16, 2019, but another forensic examiner, Erin Engle, conducted the examination. Engle did not testify at trial because she was on maternity leave. Jones stipulated to the admission of a certified copy of Engle's medical examination report. The report indicated the date of MM's sexual assault as September 11 or 12, 2019, identified Command as the perpetrator of the assault, and stated that MM shook at times while speaking about the sexual assault and during the exam. The report also indicated that no acute injury was observed. Engle collected evidence during the exam using Q-tip swabs, but Hurst was unaware whether DNA testing of the swabs indicated anyone other than MM as a donor of the evidence collected using the swabs.

Erica Castor, a Michigan State Police forensic scientist, conducted DNA testing of the swabs included in MM's sexual assault examination kit. Jones stipulated to the admission of Castor's report prepared following DNA testing, which revealed the possible presence of male DNA on the vaginal cervical swabs, but that the DNA sample was insufficient for further analysis.

Command argues that the trial court erred by admitting Hurst's testimony concerning the September 2019 incident because the district court dismissed the CSC-III charge related to that incident. He asserts that the evidence amounted to other-acts evidence and that the trial court failed to instruct the jury that the evidence did not pertain to the charges for which he was on trial. Because Command's argument is not preserved for our review since Jones did not object to the admission of Hurst's testimony, our review is limited to plain error affecting Command's substantial rights. *People v Perry*, 317 Mich App 589, 600; 895 NW2d 216 (2016). Reversal is warranted only if the plain error "resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Davis*, 509 Mich at 67-68 (quotation marks and citation omitted).

Command has failed to establish plain error. Initially, we note that he characterizes Hurst's testimony as pertaining to DNA evidence, but Hurst did not testify regarding DNA evidence per se. Rather, she testified about the process of conducting a sexual assault examination, including the collection of evidence for later use in DNA testing. According to her testimony, evidence collected using Q-tip swabs is sent to the crime laboratory for DNA testing, but neither she nor Engle conducted DNA testing. Command maintains that Hurst's testimony constituted other-acts

evidence and that the jury was not instructed that the evidence did not pertain to the current charges. For the reasons previously discussed, the evidence was admissible under MCL 768.27b.[11]

The evidence involved a sexual assault, it was relevant to the charges for which Command was on trial, and unfair prejudice did not outweigh its probative value. It appears that Command takes issue with the evidence because it involved a charge that was dismissed, but MCL 768.27b does not require that the other-acts evidence involve conduct that resulted in criminal charges. As the *Berklund* Court recognized, the plain language of MCL 768.27b(1) contains only three express limitations: absent certain exceptions, the other act must not have occurred more than 10 years before the charged conduct, unfair prejudice must not outweigh the probative value of the evidence, and the evidence must be relevant. *Berklund*, ___ Mich App at ___; slip op at 4. The statute does not exclude evidence that was not criminally charged. Accordingly, Command fails to establish that the trial court plainly erred by admitting Hurst's testimony.

Command also asserts that he was denied his right of confrontation when the trial court admitted the "DNA reports" because he was unable to cross-examine Engle, which denied him the ability "to probe for potential inconsistencies or errors in the collection, handling, or analysis of the rape kit and DNA results." To the extent that Command challenges the analysis of the DNA evidence and the DNA report, his argument is misplaced because Castor authored the DNA report and testified at trial. As previously stated, Engle's medical examination report did not include information regarding the DNA analysis and testing. Further, because Jones stipulated to the admission of Engle's report, appellate review of this argument was waived. "A stipulation constitutes a waiver of any alleged error, so there is no error for us to review." *People v Eisen*, 296 Mich App 326, 328; 820 NW2d 229 (2012). "One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error." *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (quotation marks and citation omitted).

Command next argues that Jones rendered ineffective assistance of counsel by failing to object to the DNA evidence. This argument is not preserved for appellate review because Command failed to move for a new trial or a *Ginther*[12] hearing in the trial court. See *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009). "This Court reviews unpreserved claims of ineffective assistance of counsel for errors apparent on the record." *People v Spaulding*, 332 Mich App 638, 656; 957 NW2d 843 (2020). In order to establish ineffective assistance of counsel, "defendant must show that counsel's performance was objectively unreasonable and that counsel's deficient performance is reasonably likely to have affected the outcome of the proceedings." *Id*. "Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *Eisen*, 296 Mich App at 329.

---

[11] We note that the prosecutor's combined motion for joinder, motion under MRE 404(b), and MCL 768.27b notice included the conduct involving MM that occurred at a motel in September 2019.

[12] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

Command contends that the DNA evidence was inadmissible and that the jury was misled to believe that it pertained to the CSC-III charge for which he was on trial rather than to the dismissed charge. As previously discussed, evidence regarding the dismissed charge was admissible under MCL 768.27b. Moreover, Jones's failure to object to the evidence may have been strategic. A defense attorney may decide not to object to an error for strategic reasons. *People v Randolph*, 502 Mich 1, 12; 917 NW2d 949 (2018). "If counsel's strategy is reasonable, then his or her performance was not deficient." *Id*. As Command admits, the DNA test results were inconclusive. Castor testified that the cervical swabs contained "the possible presence of male DNA, but it was insufficient for further analysis" because of the ratio of male versus female DNA on the swabs. Therefore, in addition to the evidence being admissible, Jones likely deemed beneficial DNA evidence that failed to establish a connection to Command. In these circumstances, Jones's representation did not fall below an objective standard of reasonableness. *Spaulding*, 332 Mich App at 656.

## V. PROSECUTORIAL ERROR

Finally, Command asserts that the prosecutor committed prosecutorial error by asking him about the dismissed CSC-III charge during cross-examination. Jones objected to the question, and the trial court sustained the objection, although the basis for the objection is unclear from the record. Jones failed to request a curative instruction, however, and Command argues that the prejudicial impact of the question persisted despite the fact that the trial court sustained Jones's objection. In order to preserve for appellate review a claim of prosecutorial error, "a defendant must contemporaneously object and request a curative instruction." *People v Isrow*, 339 Mich App 522, 529; 984 NW2d 528 (2021) (quotation marks and citation omitted). Because Command's argument is not preserved for appellate review, our review is limited to plain error affecting his substantial rights. *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id*. at 475-476 (quotation marks and citation omitted).

During cross-examination, Command testified that he did not recall ever spending time alone with MM in his home and did not recall ever spending time with her outside of the home. The prosecutor then questioned him as follows:

> *Q*. Do you recall whether or not you ever took [MM], let's say, to the store?
>
> *A*. I do not recall exactly, no.
>
> *Q*. Okay. Do you remember whether or not you took [MM] to a hotel or to a motel to celebrate a birthday?
>
> *MR. JONES*: Objection.
>
> *THE COURT*: What's the objection?
>
> *MR. JONES*: May we approach for a second?
>
> *THE COURT*: Yes.

-18-

(Discussion held at the bench between the Court and counsel.)

*THE COURT*: Go ahead. I'm gonna—

*MR. JONES*: Judge—

*THE COURT*: I'm gonna sustain the objection.

*MR. JONES*: Thank you, judge.

As previously indicated, the basis for Jones's objection is unclear from the record, but Command asserts that the prosecutor's question referenced the dismissed CSC-III charge and was "entirely inappropriate." For the reasons previously discussed, evidence regarding the dismissed charge was admissible under MCL 768.27b, and the question was therefore proper. It is unclear why the trial court sustained the objection, but considering Command's argument with the record before us, we conclude that he has failed to establish plain error, and his claim of prosecutorial error fails.

Affirmed.

/s/ Kristina Robinson Garrett
/s/ Sima G. Patel
/s/ Christopher P. Yates

-19-